UNITED STATES DISTRICT COURT                      NOT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                    :
DESIREE PHELAN, by her parents John Phelan          :
and Ellien Phelan, and John Phelan and Ellien       :
Phelan, individually,                               :
                                                    :            **AMENDED**
                    Plaintiffs,                     :      **MEMORANDUM & ORDER**
                                                    :
                                                    :
        - against -                                 :      No. 1:04-cv-03538-ERK-CLP
                                                    :
MARISOL TORRES, individually and as                 :
caseworker; LETA MACADAEG, individually             :
and as supervisor; JUANITA BOWERS,                  :
individually and as director, ELIZABETH             :
MULLANE, individually and as director of            :
medical services; ST. VINCENT'S SERVICES,           :
INC.; MONICA HOOVER, individually and as            :
caseworker; BARBARA FELTON, individually            :
and as manager; ROBERT JACKSON,                     :
individually and as supervisor; KATHRYN             :
CROFT, individually and as Deputy                   :
Commissioner; NICHOLAS SCOPPETTA,                   :
individually and as Commissioner; and CITY OF       :
NEW YORK,                                           :
                                                    :
                    Defendants.
------------------------------------------------------------ X
DESIREE PHELAN, by her parents              :      No. 1:06-cv-01663-ERK-CLP
JOHN PHELAN and ELLIEN PHELAN,              :
                                            :
                    Plaintiff,              :
                                            :
        - against -                         :
                                            :
KINGS COUNTY HOSPITAL CENTER; NEW           :
YORK CITY HEALTH and HOSPITALS              :
CORPORATION; JEFFREY BIRNBAUM, M.D.;        :
and SUNDARI NANDANAVANAM, M.D.,             :
                                            :
                    Defendants.             :
------------------------------------------------------------ X

1

KORMAN, J.

Desiree Abson was born on December 5, 1995 at Kings County Hospital Center ("KCHC"). Desiree's mother, Darlene Abson, reported using alcohol and cocaine during her pregnancy, receiving no prenatal care, and "smok[ing] a pack of cigarettes daily since 1989." SVS Defs.' Rule 56.1 Stmt. ¶¶ 31, 32. Desiree remained at KCHC until the City of New York ("City"), through its Child Welfare Administration ("CWA"), the predecessor agency to the Administration for Children's Services ("ACS"), took custody of her on January 2, 1996 and later placed her with a foster care agency, St. Vincent's Services, Inc. ("SVS" or "St. Vincent's Services"). On February 1, 1996, after SVS placed Desiree in a foster home, Desiree began having seizures. After her third visit to the emergency room at KCHC, all of which occurred in February 1996, it was determined that Desiree had four broken ribs and bleeding in her brain. She was then diagnosed with Shaken Baby Syndrome, a devastating form of child abuse caused by violently shaking a baby, resulting in traumatic brain injury, which is characterized by a constellation of injuries including subdural hematomas (i.e., bleeding in the brain), retinal hemorrhages, rib fractures and long-bone fractures.[1] She was subsequently placed by SVS with John and Ellien Phelan, a foster care placement that led to her adoption by them on June 3, 1999.

On August 14, 2004, John and Ellien Phelan commenced an action pursuant to 42 U.S.C. § 1983 on behalf of Desiree, and on their own behalf, alleging among other things that the defendants violated Desiree's civil rights. Plaintiffs also alleged pendent claims under New York law. They named as defendants the City, St. Vincent's Services, and various employees of the City and SVS. The City employee defendants who remain in the case are Kathryn Croft,

---

[1] *See* Ex. M, Ajl Dep. 57:18–67:12; *see also Shaken Baby Syndrome*, Medline Plus Medical Encyclopedia, a service of the U.S. National Library of Medicine, National Institutes of Health ("Medline Plus"), http://www.nlm.nih.gov/medlineplus/ency/article/000004.htm (last visited Dec. 29, 2011).

Robert Jackson, Barbara Felton, and Monica Hoover. The St. Vincent's Services employee defendants who remain in the case are Marisol Torres (now Zobler, hereinafter "Torres-Zobler"), Leta Macadaeg, and Elizabeth Mullane. *See* Pls.' Opp'n Br. 1.

On April 10, 2006, almost two years after filing the first complaint, plaintiffs filed a complaint pursuant to 42 U.S.C. § 1983 against KCHC, two doctors employed by KCHC and KCHC's parent, the New York City Health and Hospitals Corporation. The KCHC employee defendants are Dr. Jeffrey Birnbaum—an attending physician—and Dr. Sundari Nandanavanam—a first year resident. Plaintiffs allege, without any specific allegation that Dr. Nandanavanam, failed to provide Desiree with adequate medical treatment. Plaintiffs also alleged three causes of action arising under New York law. The two complaints were consolidated. After an unsuccessful motion to dismiss and the completion of discovery, all the defendants moved for summary judgment.

## FACTUAL BACKGROUND

### A.    Desiree's Placement in Foster Care

#### 1.    Certification of Maitland

Maitland, who would become Desiree's foster mother, initially applied to be a foster parent with SVS on November 8, 1994. Ex. FF, at SVS 3810.[2] She is a licensed Registered Nurse and, at the time she applied, had worked as a pediatric nurse for over twelve years. Ex. K, Maitland Dep. 22:23–24:22. From 1991 to 2000, Maitland worked in the neonatal intensive care unit at Brookdale Hospital. *Id.* at 23:7-13. "Pursuant to Section 424-a of the Social Services Law, St. Vincent's Services completed a background check of Maitland." SVS Defs.' Rule 56.1 Stmt. ¶ 97. The State Central Register ("SCR") Report on Maitland, issued on February 22,

---

[2] Letter exhibits refer to exhibits filed by defendants in support of their motion for summary judgment.

1995, did not indicate any incidents of prior child abuse or maltreatment. *Id.*; Ex. FF, at SVS 3895. Desiree was placed with Maitland on January 2, 1996.

As part of the Foster Parent Application Process, Maitland's home was inspected on April 19, 1995. SVS Defs.' Rule 56.1 Stmt. ¶ 108. That same day, SVS case workers Sister Catherine Peter and Shelton Collins completed a home study and interviewed Maitland. Ex. FF, at SVS 3873-82. Maitland identified her sister, Elma Guillaume, as her backup in-home childcare provider. Ex. FF, at SVS 3880. Guillaume, who was also a registered nurse, lived with her husband and one child. *Id.*; Ex. K, Maitland Dep. 56:5-11, 57:19-22. Although SVS was required to obtain an SCR clearance for Guillaume *before* certifying Maitland, it did not do so until June 4, 1996. Pls.' Rule 56.1 Stmt. ¶¶ 70, 367. Nevertheless, when it came, the clearance reflected no prior reports of abuse or maltreatment. Ex. FF, SVS 3889.

On April 26, 1995, the New York State Department of Social Services certified Maitland as a foster parent to care for as many as three children (ages 0–8 years-old), for the period April 26, 1995 to April 26, 1996. Ex. FF, at SVS 3887-88. On October 24, 1995, Maitland submitted paperwork indicating that she could accommodate a wide range of classifications for foster children with various disabilities. Ex. FF, at SVS 3805-07. The document indicates that Maitland was willing to care for children with, e.g., brain damage, but was not willing to care for children with, e.g., HIV or "Exceptional Needs." *Id.* At the time of Desiree's placement, Maitland "was caring for two other foster care children," an eight-month-old girl and the girl's four-and-a-half year-old brother. SVS Defs.' Rule 56.1 Stmt. ¶ 87.

### 2.    *Foster care placement of Desiree with Maitland*

On January 2, 1996, KCHC discharged Desiree. On the same day, the City placed Desiree under the care of SVS. Ex. KK, at 1075; Ex. LL, at 955-56. That evening, Desiree was

placed in Janice Maitland's home on a temporary basis until the home of Delores Magwood, who had adopted Desiree's biological brother, could be recertified for foster care -- a process which was expected to take two weeks. *Id.*; Ex. K, Maitland Dep. 66:23–67:4, 128:3–130:6.

On January 4, 1996, Marisol Torres-Zobler, a SVS social worker, met with Maitland and Desiree at SVS's offices for Desiree's initial medical intake examination, conducted by Dr. Matilda Bravo. Ex. FF, at SVS 0199, SVS 1645. A neurological evaluation indicated that Desiree was "jittery." *Id.* Dr. Bravo recommended that Desiree be tested for HIV, and Maitland consented to the test that day. *Id.* at SVS 1245, SVS 1567-70. On January 29, 1996, CWA provided SVS the requisite authorization for the HIV testing. *Id.* at SVS 1243. After the requisite authorizations were obtained, Desiree was tested for HIV on February 7, 1996. EX FF, at SVS 1237. The result of the test, which was available a few days later, indicated that Desiree had HIV antibodies. *Id.* Such a result very likely "reflects the mother's HIV status," rather than the baby's status. Ex. M, Ajl Dep. 512:18–513:2; see also Ex. N, Molofsky Dep. 46:23. Indeed, plaintiffs concede that Desiree *was not in fact HIV positive*. *See* Pls.' Opp'n Br. 12.

### B. Desiree's First Hospitalization

Sometime on February 1, 1996, though the record is not clear as to when, Maitland took Desiree to see a pediatrician, Dr. Melanie Bravo (not to be confused with the SVS pediatrician, Dr. Matilda Bravo, mentioned above), because Desiree exhibited twitching in both her left hand and arm and in her lower lip and chin. Ex. FF, at SVS 1078. Dr. Melanie Bravo examined Desiree and referred her to the KCHC pediatric emergency room. *Id.* Later that day, at approximately 8:40 p.m.—the very same day—Maitland had telephoned SVS to report that Desiree was irritable, her face was twitching and that Maitland would be taking Desiree to KCHC. SVS Defs.' Rule 56.1 Stmt. ¶ 170. Less than an hour later, at approximately 9:25 p.m.,

Maitland brought Desiree to KCHC for irritability and jerky movements with a blank stare. Ex. X, at 11-16, 27. During the admitting physical examination, the physician witnessed a seizure. *Id.* at 32. Infection was among a number of possible causes considered in the differential diagnosis, and Desiree "was placed on Phenobarbital for the seizures and an antibiotic." Hosp. Defs.' Rule 56.1 Stmt. ¶¶ 5-6. Maitland called SVS again, at approximately 11:30 p.m., to report that Desiree was being admitted to KCHC. SVS Defs.' Rule 56.1 Stmt. ¶ 173.

On February 2, 1996, Dr. Schubert, a pediatric neurologist, who examined Desiree, noted that there was "[n]o evidence of head trauma." Ex. BB, at M001809. Nevertheless, she ordered a number of tests, including a "stat CT scan," an imaging method that uses x-rays to create cross-sectional pictures of the body. Ex. X, at 41. The report of the scan of Desiree's head, which was taken that same day, states that the "images are remarkable for unusually dense areas seen in the region of the straight sinus, transverse sinus and superior sagittal sinus." Ex. BB, at M001854. And that the "etiology of these regions of increased density include superficial sinus thrombosis [i.e., a blood clot] *or* acute subdural hematoma." *Id.* (emphasis added). An acute subdural hematoma is a collection of blood on the surface of the brain that results from a serious head injury.[3] Subdural hematoma is one of a constellation of indications of Shaken Baby Syndrome, along with retinal hemorrhaging, long bone fractures, and rib fractures. Ex. M, Ajl Dep. 57:18–67:12.[4]

The radiology report also recommended an MRI of the brain. Ex. BB, at M001854. Dr. Schubert testified that he agreed and he directed that one be done. Ex. 79, Schubert Dep. 22:12-23:8; Ex. BB, at M001832. Dr. Schubert testified that "it would have been helpful to have the

---

[3] *Subdural Hematoma*, Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/000713.htm (last visited Dec. 29, 2011).

[4] *See also Shaken Baby Syndrome*, Medline Plus, *supra* note 2.

[MRI, b]ut as [Desiree] stabilized, it became less urgent [because] it was no longer an emergency. It wasn't a question of acute management anymore." Ex. 79, Schubert Dep. 23:16-22. Ultimately, it was determined that the MRI would be done on April 11, 1996 at Downstate Medical Center, at the same time as her next clinic visit. *Id.* at 25:17-19.

Significantly, although plaintiffs' pediatric experts, Drs. Ajl and Molofksy, testified that most infants who have been shaken will have retinal hemorrhages, there was no evidence that Desiree had retinal hemorrhaging. Ex. M, Ajl Dep. 117:7–9; Ex. N, Molofsky Dep. 150:2-11. Nor was she observed to have had any bruises, abrasions, cuts, marks, or injuries, or any further seizures during her first admission. SVS Defs.' Rule 56.1 Stmt. ¶ 248; Hosp. Defs.' Rule 56.1 Stmt. ¶ 10. Because child abuse was not considered a possible cause of Desiree's symptoms, she was treated for an infection and additional tests were run to rule out a metabolic disorder. *Id.* at 315:18-316:10; Ex. M, Ajl Dep. 316:11-17. She was discharged on February 16, 1996.

### C. Desiree's Second Hospitalization

Two days later, on February 18, 1996, at approximately 7:45 p.m., Maitland brought Desiree back to KCHC with complaints of nasal congestion, coughing and occasional vomiting after coughing. Ex. CC, at M000187, M000192, M000214. A chest x-ray was taken of Desiree later that night. The results of this x-ray were not discussed or reported in any clinical notes or typewritten report, on any date during this admission. A handwritten report concerning this chest x-ray, however, did not indicate rib fractures. Ex. PP. Plaintiffs' expert, Dr. Ajl, testified that the rib fractures were seven to twelve days old—a time frame that suggests the fractures may have been caused by a procedure while Desiree was hospitalized, and not while she was in Maitland's home. *See infra* p. 40.

During the same visit, the attending pediatrician at KCHC, Dr. Jeffrey Birnbaum, examined Desiree and found her to be alert and active in no apparent distress, and that she had bilateral rhinorhea, i.e., runny nose, and congestion. Ex. CC, at M000200-201. Dr. Birnbaum testified that he was trained to identify signs of child abuse and neglect, and would have noted any signs of abuse if he noticed any while examining Desiree. Ex. J, Birnbaum Dep. 115:13–117:13. He did not note any signs of abuse. SVS Defs.' Rule 56.1 Stmt. ¶¶ 268-69. Because Desiree did not have any seizures during her second hospitalization at KCHC, Dr. Birnbaum's opinion was that Desiree's seizure disorder was under control. Ex. J, Birnbaum Dep. 49:2–8.

Nevertheless, Dr. Birnbaum failed to request and review Desiree's hospital chart from her first hospitalization, from which she had been discharged only two days earlier, although it was standard practice for KCHC doctors to request charts from prior hospitalizations when an infant was subsequently hospitalized. Ex. 64, Chari Dep. Tr. 35:9–18. Plaintiffs allege that the chart would have reflected a dangerous increase in Desiree's head circumference between her initial release from KCHC on January 2, 1996 and her second hospitalization on February 18, 1996. The evidence, discussed *infra* p. 40-42, however, casts significant doubt to the whether any such unusual increase in the head circumference had occurred.

Desiree was discharged from KCHC on February 22, 1996. Hosp. Defs.' Rule 56.1 Stmt. ¶ 15. At that time, she was alert and active and her lungs were clear. *Id.*; Ex. Y, 742, 767. Desiree's hospital records for this admission do not contain any notes regarding any bruises, abrasions, cuts, marks, or injury to Desiree. SVS Defs.' Rule 56.1 Stmt. ¶ 269. Nor do the notes reflect any bruising, pain or tenderness to Desiree's rib cage. *Id.* ¶ 270. The diagnosis, following this hospitalization, was that Desiree had suffered from acute respiratory infection, convulsions, and anemia. *Id.* ¶ 277.

### D.    Desiree's Third Hospitalization

On February 27, 1996, at approximately 4:30 a.m., Maitland brought Desiree back to the KCHC emergency room because Desiree had another seizure.  Ex. Z, at 940-945.  Initially, the cause of these conditions was again suspected to be an infection, "possibly HIV related."  *Id.* at 974.  Drs. Chari and Schubert noted that the possible etiology of Desiree's seizures included perinatal insult (i.e., birth trauma) and toxic embryopathy (i.e., birth defect).  Ex. DD, at M000407.

Later on February 27, 1996, a CT scan of Desiree's head was performed.  *Id.* at M000425.  At approximately 8:15 p.m. on February 27, a KCHC neurosurgery physician was notified of the CT Scan results, which "revealed bilateral subdural hematomas and multiple hypodensities."  Hosp. Defs.' Rule 56.1 Stmt. ¶ 17.  A chest x-ray taken that day indicated that Desiree's ribs were fractured.  Ex. DD, at M000424.  Nothing in Desiree's hospital records suggests that anyone communicated any information regarding rib fractures prior to February 27, 1996.  Ex. N, Molofsky Dep. 360:13–361:3.

On February 29, 1996, at approximately 11:00 a.m., the first notation is made in Desiree's hospital charts reflecting a suspicion of child abuse.  Ex. DD, at M000275.  The Pediatric Child Abuse Attending Physician, Dr. Ajl, who was consulted, wrote that "at present this child has at least 3 [left] posterior rib [fractures], [right] periostal [reaction,] [right] humerus, [*sic*] and bilateral subdural hematoma (old) and possible intracerebral infarctions . . . . This is shaken baby syndrome (eye exam pending)."  Ex. Z, at 000978.  At approximately 3:00 p.m., on February 29, 1996, Dr. Lim contacted the police, ACS, and SVS to report the suspected abuse.  Ex. DD, at M000277.

When SVS was so notified on February 29, 1996, based on the x-rays showing rib fractures, Desiree (though still at KCHC) was "promptly pulled" from Maitland's care, Ex. M, Ajl Dep. 404:23-405:3, and Maitland's home was ultimately involuntary closed by the City, Ex. 42, at Phelan 20102.[5]

### E.    Proximate Cause of Desiree's Injuries

There is circumstantial evidence suggesting that at least some of Desiree's injuries were suffered when she was in Maitland's care. Not only did injury to Desiree occur during this period, but, when OCI interviewed Maitland, following the KCHC doctor's report that Desiree had been abused, Maitland stated that she had used a babysitter named "Marianne," whose last name and address she did not know. Ex. 42, at PHELAN 20071–72; Ex. 72, Graham Dep. 43:4-25. "Marianne" was never identified, located, or interviewed as part of the OCI investigation. *Id.* The only babysitter Maitland told SVS she would use was her sister, Elma Guillaume; yet, when interviewed by OCI, Guillaume denied that she ever cared for Desiree. Ex. 42, at PHELAN 20 093. Maitland also identified Desiree Abson as Shonda Arbun, on February 1, 1996, when she brought Desiree to Dr. Melanie Bravo and to the KCHC emergency room, when Desiree began having seizures. Ex. FF, at SVS 1078; Ex BB, M001795-96. While she took other action at the same time that was inconsistent with a desire to hide the identity of the child—including telephoning SVS immediately before and immediately after taking Desiree to KCHC, one inference, as she explained to SVS either on February 1st or 2nd, was that she provided the wrong name because "she was nervous about the baby's condition." Ex. 47, SVS 0739. Consequently, I will assume for purposes of the following analysis that a reasonable jury could conclude that Desiree was injured while she was under Maitland's care.

---

[5] Numbered exhibits refer to exhibits filed by plaintiffs in support of their motion for summary judgment.

**DISCUSSION**

To establish their claims under 42 U.S.C. § 1983, plaintiffs must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under the color of state law. *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). The Second Circuit has held—in the words of the Supreme Court—that a "State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 n.9 (1989) (citing *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141-42 (2d Cir. 1981), *cert. denied sub nom. Catholic Home Bureau v. Doe*, 464 U.S. 864 (1983)). Indeed, the case of foster children is closely analogous to that of individuals involuntarily committed to a state institution for the mentally retarded, who have also been held to have substantive rights under the Fourteenth Amendment's Due Process Clause. *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). These rights, the Supreme Court held, are violated by professional caretakers "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. This standard "is essentially a gross negligence standard." *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 790 (2d Cir. 1983) ("*Doe II*"). Such a standard, which is arguably more protective than the deliberate indifference applicable to an individual incarcerated for criminal activity, is based on the Supreme Court's judgment that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321-22. Clearly, an infant, such as Desiree, who is in the custody of the City, is likewise entitled to a standard that

11

affords her greater protection than that afforded to an individual incarcerated for criminal activity.

A constitutional violation, however, is only the threshold showing in order to establish liability of a municipality or public entity. In addition to showing that a public employee violated a foster child's substantive due process rights through gross negligence, plaintiffs must also establish that the violation occurred under an official custom or policy. Thus, the City, the New York City Health and Hospitals Corporation, KCHC, and SVS may be held liable under § 1983 only for a violation of constitutional rights committed pursuant to an official policy or custom.

While the terms "policy" and "custom" are often used interchangeably, the two words reflect separate legal concepts. "The Supreme Court has identified at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood (i.e., a formal act by the municipality's governing body), and (2) where a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken." *Davis v. City of New York*, 228 F. Supp. 2d 327, 336–37 (S.D.N.Y. 2002) (citing *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978), and *Pembaur v City of Cincinnati*, 475 U.S. 469, 480–81 (1986)), *aff'd* 75 Fed. Appx. 827 (2d Cir. 2003); *see also Walker v. City of New York*, 974 F.2d 293 (1992). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). This is based on the premise that, where a custom and practice is so "'well settled and widespread . . . the policymaking officials of the municipality

can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" *Davis*, 228 F. Supp. 2d at 337 (quoting *Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997)). "Widespread means that acts [complained of] are common or prevalent throughout the agency; well-settled means that the acts [complained of] have achieved permanent, or close to permanent, status." *Id.* at 346. Moreover, even where a policy or practice is established, a plaintiff must establish "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

I proceed to discuss the application of these principals to the potential liability of SVS, then the New York City Health and Hospitals Corporation, and finally the City. In the course of so doing, I also address the liability of each of their individual employees who are named as defendants.

### A.  Saint Vincent's Services

#### 1.  St. Vincent's Services' Liability Under § 1983

Because SVS is private entity, the threshold issue is whether a cause of action against it lies under § 1983. Relying on *Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974), and *Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977), plaintiffs assert that SVS, "as a foster care agency, . . . operate[s] under color of state law." Pls.' Opp'n Br. 24–25. While these two cases support plaintiffs' argument, the Supreme Court has so dramatically changed the legal landscape in this area that these cases are arguably no longer good law.

Professor Martin Schwartz has observed perceptively that, in analyzing the state action jurisprudence, "it is important to consider the era in which the decision was rendered." 1A MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION: CLAIMS AND DEFENSES § 5.12, at 5-85 (4th ed. 2003). He explains that, the Warren Court took an expansive view of state action in its effort to combat racial discrimination in society. *Id.*; s*ee also* Burt Neuborne, *The Gravitational Pull of*

*Race on the Warren Court*, 2010 Sup. Ct. Rev. 59, 73-74 (2010). The subsequent Burger and Rehnquist Courts reversed this trend, however, in favor of shielding private behavior from the reach of the Constitution. Schwartz, *supra*, at 5-85 to 5-86. This reversal occurred through a series of decisions that applied precedents in a "narrow, stringent fashion" to find no state action despite heavy government involvement in private conduct. *Id.* at 5-86. These decisions sent the unmistakable message that the concept of state action is to be given only limited berth, and that federal courts must assess the continued vitality of earlier state-action precedents in light of more recent decisional law. *Id.*

Professor Schwartz explains that four principles have emerged as the Supreme Court has narrowed the scope of its state-action jurisprudence:

> 1. Mere state regulation of private conduct, even if extensive, is insufficient to support a finding of state action.
>
> 2. State authorization of private conduct does not make the private party a state actor; to find state action, the state must participate in, order, coerce, or significantly encourage the contested activity.
>
> 3. State assistance to a private party, even if substantial, will not support a finding of state action, whether that assistance is in the form of direct financial aid, tax exemptions, monopoly power, government mortgage insurance, or the grant of a license.
>
> 4. The mere importance of the function carried out by the private sector is an insufficient basis upon which to find state action; for state action to be found, the function must be historically, traditionally, and exclusively governmental.

*Id.* at 5-87 to 5-88. The Supreme Court has found no state action even in cases where all four of these government involvements existed. *Id.* at 5-88. Thus, even an entity that is "extensively regulated, obtained governmental approval, received substantial governmental assistance, and performed an important societal function" has been held to not engage in state action. *Id.* at 5-88 (citing *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522 (1987); *Rendell-Baker v.*

*Kohn*, 457 U.S. 830 (1982); *Blum v. Yaretsky*, 457 U.S. 991 (1982); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)). Against this backdrop, I turn to *Perez* and *Duchesne*, and *Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255 (2d Cir. 2008), the recent Second Circuit decision that reflects the accuracy of Professor Schwartz's analysis.

*Perez* primarily relied on the public function test to determine that "the acts of the private institutions," in detaining appellant's children, and refusing to return them to her custody, "were 'under color of' state law." *Perez*, 499 F.2d at 764. The Second Circuit explained that, "[i]n certain instances[,] the actions of private entities may be considered to be infused with 'state action' if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties." *Id.* at 765. Under the New York State statutory scheme, as the Court elaborated, (1) state officials are "responsible for the welfare of children who are in need of public assistance and care, support and protection," and (2) the State may fulfill this responsibility by providing "direct assistance" or by "utiliz[ing] private entities." *Id.* Where it chooses to use a private institution, the State, "in effect . . . provid[es] the care through the private institution[]." *Id.*

*Perez* also noted that it did not have to rely "solely on the public function theory . . . to support, [the] conclusion that 'state action' exists." *Id.* Specifically, it observed that the "comprehensive statutory regulatory scheme of the New York Social Services Law is persuasive, perhaps compelling, evidence of the degree to which the State has insinuated itself into the actions of the private defendants here." *Id.* This "insinuation" derived from the fact that New York State law "makes the state bear the responsibility for the care of all children in need of assistance." *Id.* (citing N.Y. Soc. Servs. Law § 395). Moreover, *Perez* observed that the State's "dependence . . . on private parties is a factor which tends to establish the intimacy requisite to

finding of 'state action.'" *Id.* at 766 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)).

In *Duchesne*, the Second Circuit was asked to reconsider its holding on the state action question in light of *Jackson v. Metropolitan Edison Company.* In *Jackson*, the Supreme Court held that supplying of utility service is not state action because it "is not traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353. The Second Circuit, without any further elaboration, stated: "We have considered the implications of [*Jackson*], but reaffirm our earlier finding of state action." *Duchesne*, 566 F.2d at 822 n.4.

The Supreme Court's state action jurisprudence since *Perez* and *Duchesne* has increasingly "emphasize[d] the 'exclusivity' aspect of the [public function] test." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995). Thus, in *Blum v. Yaretsky*, the Court held that the private "nursing homes' decisions to discharge or transfer Medicaid patients to lower levels of care" was not state action, in part because nursing homes do not "perform a function that has been 'traditionally the *exclusive* prerogative of the State.'" 457 U.S. at 1011-12 (quoting *Jackson*, 419 U.S. at 353) (emphasis added). Similarly, in *Rendell-Baker v. Kohn*, while acknowledging that a private school's "education of maladjusted high school students is a public function," the Supreme Court also emphasized that point "is only the beginning of the inquiry." 457 U.S. at 842. And, it stressed that its "holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function' . . . . [T]he question is whether the function performed has been 'traditionally the exclusive prerogative of the State.'" *Id.* (citing *Jackson*, 419 U.S. at 353; *Blum*, 457 U.S. at 1011) (emphasis in original). Because the function of providing education for students who could not be served by traditional public

schools was not traditionally undertaken by the State of Massachusetts, the publicly funded private school providing such special education was not a state actor. *Id.*

Similarly, caring for abandoned children is a function that has traditionally been performed by private parties in New York. One history of New York's social welfare legislation explains that, in the 1880s, New York began to regulate the private "societies for the care of children," which were required to apply for a license and keep certain records concerning the children for whom they cared. Nathaniel Fensterstock, *History of New York Social Welfare Legislation*, *Introduction* to N.Y. Soc. Welfare Law (McKinney Vol. 52A 1941) (available in microfiche). In 1898, "The Placing Out Law" was passed, which "conferred upon the State Board of Charities jurisdiction over dependent children placed out by charitable societies or by individuals in family homes." *Id.* at XXXVII & n.107 (describing inspection and oversight prerogative of the State Board of Charities over child-placement organizations). "By the end of the nineteenth century, the pattern of child care in the State had become so well defined that it was known as the 'New York System.' The 'System' primarily consisted of placing dependent and neglected children who were public charges under the care of private agencies, with the responsible counties, cities and towns paying for the services provided." *Wilder v. Sugarman*, 385 F. Supp. 1013, 1020 (S.D.N.Y. 1974) (citing David M. Schneider & Albert Deutsch, *The History of Public Welfare in New York State 1867-1940*, at 160 (1941)).

The statutory provision, which *Perez* and *Duchesne* rely on to support their holding that private foster placement agencies may qualify as state actors, provides:

> A public welfare district shall be responsible for the welfare of children who are in need of public assistance and care, support and protection, residing or found in its territory, insofar as not inconsistent with the jurisdiction of a family court. Such assistance and care shall be administered either directly by the public welfare official charged therewith, or by another public

> welfare official acting on his behalf by and pursuant to the
> provisions of this chapter, or through an authorized agency as
> defined by this chapter.

N.Y. Soc. Serv. Law § 395 (McKinney 2003). This statute, adopted in 1929, does not establish

that foster placement services were "traditionally" performed by the state, nor does it establish

that foster placement services were then or are now *exclusively reserved* to the state, as is now

required of a public function under the Supreme Court's current jurisprudence. *See, e.g.*,

*Jackson*, 419 U.S. at 352. Indeed, the Family Court observed in a 1966 decision that private

agencies remained the principal providers of foster placement services in New York City. *See In*

*re Bonez*, 272 N.Y.S.2d 587, 592 (N.Y. Fam. Ct. 1966) ("The City Public Welfare District has

continued to allocate children to private agencies for foster home care and for adoptive care . . .

and has continued to use public funds to maintain these children in shelter care or other forms of

care that did not meet their needs."). The Second Circuit likewise observed that,

> [i]n pursuance of a long tradition, [New York City] has elected to
> rely heavily on private agencies [to provide foster care services to
> abused or neglected children.] . . . Most of [these private agencies]
> are religiously affiliated. These agencies place the child either
> with a foster family or in an institution run by the agency,
> depending on the child's needs.

*Wilder v. Bernstein*, 848 F.2d 1338, 1341 (2d Cir. 1988); *see also* Martin Guggenheim, *State-*

*Supported Foster Care: The Interplay Between the Prohibition of Establishing Religion and the*

*Free Exercise Rights of Parents and Children:* Wilder v. Bernstein, 56 Brook. L. Rev. 603, 605

(1990) ("New York has, since colonial times, depended on religious affiliated institutions and

agencies to care for state wards."). Finally, the Appellate Division recently held that "the

function of caring for children in need of foster care" may be deemed a "governmental function"

for purposes of applying the New York governmental immunity defense, *not because it has*

*historically been provided by the state*, but because this function "is deemed best executed by

government and is undertaken [by the government] without thought of profit or revenue."
*Kochanski v. City of New York*, 908 N.Y.S.2d 260, 262–63 (N.Y. App. Div. 2010).[6]  These

authorities provide persuasive support, under the Supreme Court's current jurisprudence, for the

conclusion that foster care placement is not a public function.

    *Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255 (2d Cir. 2008)

(per curiam), provides additional compelling support.  The plaintiffs in *Sybalski* were the parents

of a resident at a group home for mentally disabled adults.  *Id.* at 256.  They alleged that, in

response to their numerous complaints "about the care, protection and services received by their

son at the group home," defendants had "issued letters seeking to punish and intimidate plaintiffs

and impose illegal and unlawful restrictions on plaintiffs['] right to visit and communicate with

their son."  *Id.* at 256–57 (alteration in original) (internal quotation marks omitted).  Although a

private corporation owned the group home, plaintiffs argued that it qualified as a state actor

under the joint action and public function tests because

> "[t]he State, by statute and regulation, has assumed a duty to
> provide custody, care and habilitative services to its mentally
> retarded citizens," and "[w]here the State chooses to delegate those
> responsibilities and a private entity assumes them, as here, neither
> the State nor the private entity may assert that the entity's acts and
> omissions do not occur under color of state law."  In essence, [the
> plaintiffs] argue that the state has undertaken to care for its
> mentally disabled citizens by (1) acting jointly with defendants to

---

[6] The traditionally-private nature of foster placement services is not specific to New York.  The First, Third, and Fourth Circuits have similarly observed that "child care and placement is not traditionally the exclusive prerogative of the state."  *Malachowski v. City of Keene*, 787 F.2d 704, 711 (1st Cir. 1986) (per curiam); *Leshko v. Servis*, 423 F.3d 337, 343 (3d Cir. 2005) ("No aspect of providing care to foster children in Pennsylvania has ever been the exclusive province of the government."); *Milburn v. Anne Arundel Cnty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir.) ("The care of foster children is not traditionally the exclusive prerogative of the State."), *cert. denied*, 493 U.S. 850 (1989).  Scholars have also observed that, "[u]niquely, foster care had originally been provided by private agencies with public agencies later joining as partners.  It was always a 'privatized' system, never an exclusively public one."  Susan Vivian Mangold, *Protection, Privatization, and Profit in the Foster Care System*, 60 Ohio St. L.J. 1295, 1298 (1999).

>    provide care for the mentally disabled and (2) delegating the public
>    function of caring for the mentally disabled to defendants.

*Id.* at 258 (first and second alterations in original) (citations omitted) (quoting plaintiffs'

appellate brief).

The Second Circuit rejected this argument, which mirrors the argument made by the

plaintiffs in this case, because the "care for the mentally disabled was neither traditionally nor

*exclusively* reserved to the state." *Id.* at 259 (emphasis added). Looking at the history of the

treatment of the mentally ill in New York provided in *Okunieff v. Rosenberg*, 996 F. Supp. 343,

356 (S.D.N.Y. 1998), it found that caring for the mentally ill and mentally disabled had not

traditionally been under the exclusive authority of the state. *Sybalski*, 546 F.3d at 259-60. The

Court thus clearly held that "private actors must be delegated functions that were traditionally

under the *exclusive* authority of the state for the public function test to be satisfied." *Id.*

(emphasis added). Indeed, the "earliest movement toward complete state care did not come until

the second half of the nineteenth century." *Id.* (quoting *Okunieff*, 996 F. Supp. at 356).

Consequently, the Second Circuit concluded that "defendants' actions cannot be attributed to the

state under the public function test." *Id.* at 260.

In the present case, even though they were given the opportunity, *see* Sept. 24, 2011

Order, plaintiffs have not presented any evidence that caring for abandoned children by placing

them in foster homes was traditionally under the exclusive authority of the state. On the

contrary, the evidence discussed earlier demonstrates that it was not until the end of the

nineteenth century that New York enacted "The Placing Out Law," which "conferred upon the

State Board of Charities jurisdiction over dependent children placed out by charitable societies or

by individuals in family homes." Fensterstock, *supra*, at XXXVII & n.107. Neither *Perez* nor

*Duchesne* expressly considered, much less held, that caring for abandoned children was a power "traditionally *exclusively* reserved to the State." *Jackson*, 419 U.S. at 352 (emphasis added).

Nor can plaintiffs demonstrate the existence of state action in this case under any other available theory. In *Sybalski*, the Second Circuit recognized that pursuant to the New York Mental Hygiene Law, "facilities licensed by the state to provide care and treatment to the mentally disabled are subject to regulation, licensing, and oversight by the commissioner of mental health and the commissioner of mental retardation and developmental disabilities." 546 F.3d at 258. It nevertheless held that this extensive regulation, which included "substantive rights for patients in mental health facilities and procedures for protecting these rights, . . . [did] not amount to 'significant encouragement,' 'willful particip[ation],' or state 'entwin[ing]' in defendants' decision to restrict the Sybalskis' access to their son." *Id.* (third and fourth alterations in original) (citation omitted); *see also Jackson*, 419 U.S. at 350 ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State . . . . Nor does the fact that the regulation is extensive and detailed . . . do so."). Moreover, the Supreme Court has said that "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

*Sybalski* relied on *Blum v. Yaretsky*, which rejected the argument that the extensive funding and regulation of nursing homes, which included a requirement that a physician complete a form justifying the decision to discharge a patient, made the state responsible for that decision. *Id.* at 258–59. The state's requirement that the form be completed was not determinative because "the physicians, and not the forms, make the decision about whether the patient's care is medically necessary." *Id.* at 259. Consistent with *Blum*, *Sybalski* held that,

"[w]hile the State of New York has established *procedures* governing the limitations that mental health facilities place on the ability of patients to receive visitors, the administrators of those facilities make the *decision* about whether such limitations should be imposed." *Id.* (emphasis in original).

In this case as well, plaintiffs have not identified any evidence that the acts of the City defendants involved "significant encouragement," "willful particip[ation]," or state "entwin[ing]" in SVS's decision to place Desiree with Maitland, to pursue or not to pursue any specific course of medical treatment while at KCHC, or to return Desiree to Maitland's care after Desiree's first and second hospitalizations. While the City chose SVS as the foster care agency to oversee Desiree's placement, it was SVS who chose Maitland as the foster parent. Indeed, plaintiffs complain about the lack of City involvement in the selection of Maitland, and they allege that the City chose SVS simply based on the City's "'next available bed' policy." Pls.' Opp'n Br. 4; Defs.' Ex. LL, at 0955. As explained by Diana Cortez, an ACS employee, when a child goes into foster care with one of the contract agencies, it is the foster care agency that selectes the foster home. Ex. 66, Cortez Dep. 35:14-18. More specifically, "[w]hen a child is ready to come into placement, . . . [ACS allocations] have to check the . . . computer system to see which bed is available . . . , so that the contacted agency whose name pops up that has the available bed, that's the home that is selected basically." *Id.* at 36:4-12, ECF. Doc. No. 405.

Moreover, *Sybalski* also makes clear that the proposition that private child-caring institutions may be state actors by virtue of their contractual relationship with the State is likewise no longer a valid basis for finding state action. The fact that the state may contract with a private party to perform a function does not transform the private party into a state actor unless the function is traditionally exclusively a state function. *Cooper v. U.S. Postal Serv.*, 577 F.3d

479, 492 (2d Cir. 2009).  Although the state and private entities might, by virtue of a contractual relationship, be engaged jointly in the general mission of caring for abandoned children, only the *joint acts* of the private entity and the state are subject to challenge as state action.  *See Sybalski*, 546 F.3d at 258.  As Professor Schwartz observes, "[s]tate authorization of private conduct does not make the private party a state actor; to find state action, the state must participate in, order, coerce, or significantly encourage the contested activity."  Schwartz, *supra*, at 5-87; *see, e.g.*, *Blum*, 457 U.S. at 1004 ("[O]ur precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.").  There is no evidence in the record showing that the City participated in, coerced, or significantly encouraged any of SVS's challenged acts.  Moreover, "[t]here is no indication or evidence that the [City] encouraged or permits the [physical] abuse of foster children or that [it] encourages or permits foster care providers to ignore, fail to investigate, or fail to report incidents of child abuse."  *Lynn ex rel. Julie B. v. St. Anne Inst.*, No. 03-1333, 2006 WL 516796, at *17 (N.D.N.Y. Mar. 2, 2006).

Nevertheless, assuming—as I am obligated to do until the Second Circuit holds otherwise—that SVS is a state actor, I next address whether the conduct of SVS's employees constituted a constitutional violation of Desiree's rights and, if so, whether SVS can be held responsible for the conduct of its employees.  These two issues are analytically separate.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 n.8 (1989) ("[T]he proper standard for determining when a municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred."); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) ("[Q]uite apart from the state of mind

required to establish the underlying constitutional violation . . . a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." (citation omitted)). This "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. More recently, in the context of a failure to train case, the Supreme Court reiterated that

> [a] pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S., at 409 . . . . Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'— necessary to trigger municipal liability." *Id.*, at 407 . . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). Plaintiffs rely on failure to supervise and failure to train in order to establish liability against SVS under § 1983.

### 2. *Failure to supervise*

That the "deliberate indifference standard governs municipal liability claims based upon inadequate training logically extends to municipal liability claims based upon inadequate supervision, and many decisions so hold." SCHWARTZ, *supra*, § 7.18[B][1], at 7-204; *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("Although *City of Canton* addressed a claim of a failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims."). Moreover, although SVS is not a municipal corporation, the standard for determining whether SVS can be held responsible for the

conduct of its employees under § 1983 is the same as the standard for determining when a municipality can be held responsible for the actions of its employees. *See Green v. City of New York*, 465 F.3d 65, 82 (2d Cir. 2006); SCHWARTZ, *supra*, § 6.04, at 6-41 n.159.

Perhaps the leading Second Circuit case discussing the theory of failure to supervise as a basis for imposing liability is *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004), which involved the police's use of excessive force against arrestees at two anti-abortion demonstrations. The plaintiffs proffered evidence "that the necessity for more supervision was glaringly obvious at both demonstrations and that [the Chief of Police] ignored the alleged constitutional violations [then] in progress." *Id.* at 127-28. In holding that the evidence, if credited by a jury, could establish a claim for failure to supervise, then-Judge Sotomayor set out the following standard for a claim based on failure to supervise: "[P]laintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Id.* at 128 (citation omitted); *see also Connick*, 131 S. Ct. at 1360.

The placement of Desiree with Maitland fails to satisfy this standard. Indeed, Judge Sand, in a case similar to this one, rejected a § 1983 cause of action against a private foster care agency for failure to supervise. *Park v. City of New York*, No. 99 Civ. 2981, 2003 WL 133232 (S.D.N.Y. Jan. 16, 2003). In so doing, he held that a substantive due process claim did not lie where a foster parent "was a trained and licensed foster care provider, was not listed in the Central Register, and had no criminal record," and where there were "no complaints or other evidence of inappropriate guardianship" until almost three weeks after the children left foster

care.  *Id.* at \*15; *see also Richards v. City of New York*, 433 F. Supp. 2d 404, 426–27 (S.D.N.Y. 2006) ("[S]upervisors do not possess the requisite mental state of deliberate indifference when the children are placed with a trained and licensed foster care provider, who was not listed in the Central Register, and had no criminal record." (internal quotation marks and alterations omitted)).  Here, Maitland was a trained and licensed foster care provider and pediatric nurse, who had no criminal record and was not listed in the Central Register.  SVS Defs.' Rule 56.1 Stmt. ¶¶ 97–99.  Moreover, she had been a foster parent for approximately one year, and during that period, she had cared for up to three foster children simultaneously, without any incidents of abuse.

Plaintiffs argue that, because Maitland had "such a demanding work schedule" and already had two other foster children under school age, "[a] reasonable jury could find that SVS's failure to determine who would actually be caring for the children—who, in reality, would be the foster mother—showed deliberate indifference to [the] safety of the children placed in their care." Pls.' Opp'n Br. 44-45.  The record in this case provides a basis for a jury to conclude that the SVS home study and review of the backup supervision plans might have been deficient in that (1) there is no clear evidence that any SVS employee ever spoke to Guillaume prior to Desiree's placement with Maitland, (2) there is no indication that SVS asked about the scheduling and logistics of Maitland's backup childcare plan, and (3) an SCR report on Guillaume was not ordered until after Desiree had been removed from Maitland's home.[7]

---

[7] Plaintiffs' description of one SVS document, upon which they rely in this context, is misleading.  Plaintiffs state that "Gail Williams, a nurse at SVS, was concerned for Ms. Maitland because 'she spends a lot of time at the hospital with this baby, has other children, and works.'"  Pls.' Opp'n Br. 46 (citing Ex. 46, SVS 1054).  From this statement (and a few others), plaintiffs argue that "a reasonable jury could conclude that placing Desiree in Ms. Maitland's home showed a deliberate indifference to her safety and health."  *Id.*  The statement from Williams, which appears to reflect concern with the care of Maitland's two other foster children, was dated February 27, 1996—following Desiree's third admission to KCHC, after which she never returned to Maitland's home.  This was also two months after Desiree was placed in Maitland's home and ten months after Maitland's home study was

Nevertheless, even if this constituted gross negligence on the part of SVS's employees sufficient to establish a violation of the Constitution, plaintiffs have not adduced evidence that *SVS's policies and procedures* for vetting a foster parent's childcare arrangements were deliberately indifferent to the foster children's constitutional rights. Nor have they adduced evidence that any supervisory official at SVS was aware of the deficiency in vetting the placement in this particular case. Indeed, Dr. Blake, plaintiffs' expert, acknowledged that SVS's policy and procedure clearly stated that a foster parent's babysitter must be thoroughly studied before a foster child placement is approved. *See* Ex. 53, at 6; Pls.' Opp'n Br. 44 n.11 (acknowledging SVS's policy). Plaintiffs argue, however, that no paperwork is present in SVS's file on Maitland to indicate that such an interview was conducted with Guillaume. Pls.' Opp'n Br. 44 n.11. While, in this case, this policy may not have been followed by an SVS employee, both the Supreme Court and the Second Circuit have made it clear that, without more, a city would not automatically be liable under § 1983 if one of its employees applied an otherwise appropriate policy in an unconstitutional manner. *City of Canton*, 489 U.S. at 387; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 326-27 (2d Cir. 1986). The imposition of liability in those circumstances could only rest on respondeat superior, a basis for liability that is not available under § 1983. *See City of Canton*, 489 U.S. at 387.

Nor have plaintiffs alleged, much less offered evidence, that either Torres-Zobler or Macadaeg ranked among SVS's "top supervisory personnel," a showing that would also justify the imposition of liability under § 1983. Specifically, there is no evidence that either of these two had any responsibility for approving Maitland as a foster parent. *See* Pls.' Rule 56.1 Stmt. ¶¶ 13–14 (Torres-Zobler was assigned "as the caseworker to supervise the delivery of foster care

approved by SVS. *See* Ex. EE, SVS 3860. Accordingly, Williams's comment could not possibly have had any bearing upon either Maitland's certification or SVS's placement of Desiree with Maitland.

services to Desiree," whereas Macadaeg was assigned "to supervise [Torres-Zobler] in the delivery of foster care services to Desiree."). Thus, even if plaintiffs could prove that Torres-Zobler did not meet or interview Desiree's babysitter, they still would not have established that SVS was deliberately indifferent to Maitland's fitness as a foster parent. Indeed, even if, as plaintiffs argue, "SVS caseworkers either knew or deliberately failed to learn that Ms. Maitland was the foster mother in name only, and that she had delegated nearly all of the care of her foster children to others," Pls.' Br. Opp'n 45, this would not suffice to impose § 1983 liability upon SVS because caseworkers are not top supervisory personnel.

The only member of SVS's top supervisory staff that plaintiffs allege was deliberately indifferent to Desiree's medical treatment is Sister Elizabeth Mullane, the director of the Positive Caring Services ("PCS"). *See Id.* at 46. But plaintiffs themselves state that "Sister Mullane visited Desiree in the hospital during her first hospitalization," and that she "directed her staff nurses to visit Desiree in the hospital during Desiree's first hospitalization." Pls.' Rule 56.1 Stmt. ¶¶ 132–33. Mullane also spoke in person with KCHC staff regarding Desiree's condition. Ex. 77, Mullane Dep. 75:19–25. Nevertheless, plaintiffs argue that "Sister Mullane knew that Desiree needed HIV testing in the beginning of February 1996" and that she was deliberately indifferent in that she failed to demand that Desiree receive HIV testing immediately. Pls.' Rule 56.1 Stmt. ¶ 131. The single page of Sister Mullane's deposition transcript that plaintiffs cite as evidence in support of this statement seems to indicate (though without any context, it is difficult to be certain) that (1) in early February 1996, Sister Mullane first became aware of Desiree and her need for HIV testing (though no one has explained *how* she became aware of Desiree or her need for HIV testing), and (2) at that time Sister Mullane was the director of SVS's PCS unit. *See* Ex. 77, Mullane Dep. 55:6–25. But as plaintiffs themselves acknowledge, Desiree was

tested for HIV on February 7, 1996. Pls.' Rule 56.1 Stmt. ¶ 47. So, the suggestion that Sister Mullane was deliberately indifferent to Desiree's need for HIV testing, when Desiree was in fact tested either shortly after or at the same time that Mullane learned of her case, is a nonstarter. Moreover, it bears repeating that it was ultimately determined that Desiree was not HIV positive.

Plaintiffs also argue that, "[a]lthough defendant Mullane and the SVS medical staff knew about the CT-scan, they never followed up, allowing the frightening health problems to continue unchecked and undiagnosed." *See* Pls.' Opp'n Br. 46-47. I pass over the testimony of Gail Williams, the SVS nurse whom the plaintiffs cite for this proposition, that she had called and followed up with the KCHC doctors as to the next steps they would take. Ex. 80, Williams Dep. 30:18-20. The next question to Williams in her deposition was "What did you find out?" *Id.* at 30:24. But her answer remains a mystery because the remainder of her deposition was not included in plaintiffs' exhibit 80. Nevertheless, as discussed above, during Desiree's first hospitalization, the various physicians at KCHC did not consider Desiree's health problems to be urgent once Desiree stabilized. Ex. 79, Schubert Dep. 22:25–23:22. An MRI was ordered, and it was anticipated to occur in early April 1996. *Id.* at 25:17-19. And Desiree was kept in the hospital from February 2nd to February 16th to monitor her condition. Plaintiffs have not produced any evidence that a single doctor or nurse who treated Desiree communicated to anyone, much less to Mullane or top supervisory staff at SVS, that (1) Desiree's symptoms were suspicious, (2) that Desiree's condition was indicative of abuse, or (3) that Desiree required any tests or treatment different from what she received at KCHC or was scheduled to receive. Indeed, plaintiffs' own expert testified that child abuse was not considered a possible cause of Desiree's symptoms during her first hospitalization. Ex. M, Ajl Dep. 316:11-17.

Perhaps more significantly, social services administrators do not exhibit deliberate indifference to the health, safety, and welfare of foster children by relying on the course of medical treatment prescribed by medical professionals. To the contrary, seeking out and relying upon the judgment of medical professionals has been deemed by the Second Circuit to be objectively reasonable. *See V.S. v. Muhammad*, 595 F.3d 426, 431 (2d Cir. 2010); *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010); *Gulett v. Haines*, 229 F. Supp. 2d 806, 817 (S.D. Ohio 2002). Accordingly, plaintiffs' argument that top SVS supervisory personnel failed to supervise Desiree's medical condition, because they relied upon and did not second-guess or somehow overrule the diagnosis offered and course of treatment prescribed by medical professionals, must fail.

Plaintiffs also allege that SVS should have suspected abuse when Maitland provided Dr. Melanie Bravo and KCHC a false name for Desiree on the evening of February 1st. Plaintiffs assert that Maitland "gave a false name to Dr. Bravo because she wanted to conceal Desiree's identity." Pls.' Rule 56.1 Stmt. ¶ 98. Moreover, plaintiffs assert that "[g]iving a hospital emergency room [a] false name for a child raises suspicions that the child has been abused." *Id.* ¶ 104. This argument is significantly undermined by the fact that Maitland called SVS twice on the very same day, February 1, 1996—once to report Desiree's condition, *see* SVS Defs.' Rule 56.1 Stmt. ¶ 170, and again to report that she was taking Desiree to KCHC, *see id.* ¶ 173. Indeed, the next day, on February 2, 1996, Torres-Zobler sent a letter to KCHC stating: "The foster mother Ms. Janice Maitland, gave the wrong name at admission because she was nervous about the baby's condition. The name the foster mother gave is baby girl Arbun. Please make a correction. Again the last name is Abson." Ex. 47, at SVS 0739. Perhaps someone should have inquired why exactly Maitland was nervous about the baby's condition, although apparently this

is not an uncommon reaction by foster parents to such circumstances.  *See* City Defs.' Reply Br., Ex. Jackson Dep. 182:3-15.   But the inference that Torres-Zobler should have had a strong suspicion that Desiree had been abused, when Maitland had personally called SVS twice the very same night to report Desiree's condition, is insufficient to support a claim of gross negligence or deliberate indifference.  Moreover, even if Torres-Zobler's conduct could be so characterized, it would not provide a basis for holding SVS liable under § 1983 because she is not a supervisor and there is no direct causal link between her conduct and any policy or custom followed by SVS.

### 3.     *Failure to train*

Plaintiffs do not develop their failure to train theory against SVS in any way in their opposition brief.  Moreover, they have admitted that SVS provided training to foster parents with whom children with special needs would be placed.  For example, plaintiffs acknowledge that "[t]he PCS unit provided individualized medical supervision as well as specially screened and trained foster parents," who would care for special needs foster children.  Pls.' Rule 56.1 Stmt. ¶ 34.  Plaintiffs also do not contest SVS's statement that "SVS case workers received training in all areas of foster parent training, placement and identification of abuse."  SVS Defs.' Rule 56.1 Stmt. ¶ 69; Pls.' Response to SVS Defs.' Rule 56.1 Stmt. ¶ 69.  In particular, as quoted above, plaintiffs do not contest that Desiree's SVS case worker "was trained on identifying signs of child abuse."   SVS Defs.' Rule 56.1 Stmt. ¶ 75; Pls.' Response to SVS Defs.' Rule 56.1 Stmt. ¶ 75.

Plaintiffs' theory appears, rather, to be that "SVS did not give Ms. Maitland any special training on how to care for children who were born HIV positive."  Pls.' Rule 56.1 Stmt. ¶ 43. They fail to suggest what training would have been or how it would have prevented the injury Desiree suffered.  Moreover, this theory fails as well because no one knew prior to Desiree's

placement with Maitland that Desiree was born HIV positive (and plaintiffs have represented that Desiree *was not in fact HIV positive*, *see* Pls.' Opp'n Br. 12). In sum, the most that can be said is that SVS had a policy of providing training but that Maitland did not receive it from one of its employees. Such an isolated departure from agency policy by an employee of SVS does not provide a basis for liability under § 1983. *See City of Canton*, 489 U.S. at 387.

### 4. *The Individual SVS Caseworkers: Torres-Zobler, Macadaeg, and Mullane*

Plaintiffs have also failed to produce sufficient evidence to show that the individual SVS defendants Torres-Zobler, Macadaeg, and Mullane were grossly negligent with respect to Desiree's safety and medical care. The evidence concerning the conduct of Mullane has already been discussed; there is nothing to indicate that Mullane acted or failed to act in disregard of a risk of serious harm to Desiree's safety or health. Nor have Plaintiffs produced sufficient evidence to support an inference that Macadaeg was grossly negligent; their opposition brief fails to mention a single specific act she performed or failed to perform. In support of the argument that Torres-Zobler was grossly negligent with regard to Desiree's safety and health, plaintiffs point to the fact that she "did not meet or interview Desiree's babysitter." Pls.' Rule 56.1 Stmt. ¶ 78. Nevertheless, plaintiffs do not provide any evidence that it was within Torres-Zobler's scope of responsibility to conduct inquiries into Maitland's babysitting arrangements.

Plaintiffs also argue generally that SVS caseworkers did not visit the foster home frequently enough or have sufficient communications with Maitland and the hospital staff during and between hospitalizations. *See, e.g.*, *id.* at ¶¶ 139–40, 180; Pls.' Opp'n Br. 46–47. This argument is inconsistent with the record evidence. Again, plaintiffs themselves state that the director of SVS's Positive Caring Services unit "Sister Mullane visited Desiree in the hospital during her first hospitalization," and "directed her staff nurses to visit Desiree in the hospital

during Desiree's first hospitalization." Pls.' Rule 56.1 Stmt. ¶¶ 132–33. Although Desiree had not yet been assigned to the Positive Caring Services unit, Mullane also spoke in person with KCHC staff regarding Desiree's condition. Ex. 77, Mullane Dep. 75:19–25; Ex. 46, SVS 0147. Moreover, Torres-Zobler (1) met with Maitland and Desiree on January 4th at SVS's offices for Desiree's initial medical intake; (2) met with Maitland and Desiree at SVS on January 29, 1996, SVS Defs.' Rule 56.1 Stmt. ¶ 161, (3) visited Maitland's home on January 30, *id.* ¶ 162, and found that "everything at the home was in compliance with SVS regulations," *id.* ¶ 164, (4) spoke to Maitland about the first hospitalization, Ex. U, Torres-Zobler Dep. 106:17–108:16, (5) contacted the hospital twice on February 2nd, SVS Defs.' Rule 56.1 Stmt. ¶¶ 180, 182, (6) visited the hospital on February 13th, Ex. U, Torres-Zobler Dep. 116:19–119:2, (7) spoke to Maitland when Desiree was discharged on February 16th, *id.* at 158:11–17, (8) spoke to Maitland again when Desiree was readmitted on February 18th, *id.* at 172:7-12, and (9) spoke to both Maitland and a doctor about the third hospitalization, *id.* at 187:21-189:18. Accordingly, Torres-Zobler, Macadaeg, and Mullane are each entitled to summary judgment with respect to plaintiffs' causes of action arising under § 1983.

### B.     The New York City Health and Hospitals Corporation and KCHC

Plaintiffs begin their discussion of the liability of the New York City Health and Hospitals Corporation ("HHC") and KCHC by erroneously conflating the issue of whether Desiree's constitutional rights were violated and issue of the liability of those corporate defendants. Thus, they argue that "Hospitals and doctors will be held liable for violating the substantive due process rights of their patients, including the right to be free from physical harm, if their conduct is 'such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" Pls.' Opp'n Br. 48 (citing *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982) and

*Bolmer v. Oliveira*, 594 F.3d 134 (2d Cir. 2010)). Again, the Supreme Court has held that "the proper standard for determining when a municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred." *City of Canton*, 489 U.S. at 388 n.8; *see also Brown*, 520 U.S. at 406-07. Moreover, neither *Youngberg* nor *Bolmer* support the proposition that a hospital is liable under the doctrine of respondeat superior for the conduct of the doctors it employs. Indeed, both *Youngberg* and *Bolmer* involved the issue whether the conduct of individual defendants constituted a violation of the Constitution under § 1983, and not the issue of the liability of the corporate or municipal employer. In the absence of any authority to support the application of the doctrine of respondeat superior to KCHC and HHC, I decline to do so here. Nevertheless, I go on to discuss the specific acts of negligence that plaintiffs allege subject KCHC, HHC and the individual hospital defendants to liability under § 1983. I apologize to the reader for repeating some of the evidence outlined in the overview of facts earlier in this memorandum. Nevertheless, in such a long opinion, some repetition is necessary.

The plaintiffs assert that an official policy or custom of deliberate indifference to Desiree's medical needs could reasonably be inferred by the jury from five separate acts of omission. This argument is without merit for the reasons that follow.

### 1. *Failure to order an immediate MRI*

When Dr. Schubert, a pediatric neurologist, examined Desiree on February 2, 1996, he noted that there was no evidence of head trauma. Ex. BB, at M001809. Although plaintiffs' pediatric experts, Drs. Ajl and Molofsky, testified that most infants who have been shaken will have retinal hemorrhages, there was no evidence that Desiree had retinal hemorrhaging. Ex. M, Ajl Dep. 117:7–9; Ex. N, Molofsky Dep. 150:2-11. The KCHC records for this hospital admission of February 1–16, 1996 did not indicate that Desiree had "any bruises, abrasions, cuts,

marks, or injuries," or any further seizures during her first admission.  SVS Defs.' Rule 56.1 Stmt. ¶ 248; Hosp. Defs.' Rule 56.1 Stmt.¶ 10.

Dr. Schubert ordered a number of tests, including a "stat CT scan." Ex. X, at 41.  The report of the scan of Desiree's head, which was taken that same day, states that the "images are remarkable for unusually dense areas seen in the region of the straight sinus, transverse sinus and superior sagittal sinus."  Ex. BB, at M001854.  And that the "etiology of these regions of increased density include superficial sinus thrombosis [i.e., a blood clot] *or* acute subdural hematoma."  *Id.* (emphasis added).  As previously observed, an acute subdural hematoma is a collection of blood on the surface of the brain that results from a serious head injury,[8]  and is one of a constellation of indications of Shaken Baby Syndrome, along with retinal hemorrhaging, long bone fractures, and rib fractures.  Ex. M, Ajl Dep. 57:18–67:12.[9]

The radiology report also recommended an MRI of the brain, a recommendation with which Dr. Schubert agreed. Ex. BB, at M001854; Ex. 79, Schubert Dep. 22:12-23:8.  A note from Desiree's hospital chart dated February 8, 1996 indicates that an MRI had been requested. Ex. BB, at M001832.  Dr. Schubert testified that "it would have been helpful to have the MRI, [b]ut as [Desiree] stabilized, it became less urgent [because] it was no longer an emergency.  It wasn't a question of acute management anymore." Ex. 79, Schubert Dep. 23:16-22.  Ultimately, an MRI was scheduled for April 11, 1996 at Downstate Medical Center, at the same time as her next clinic visit.  *Id.* at 25:17-19.

There is a conflict in the testimony as to whether Dr. Schubert's failure to order an immediate MRI to investigate the cause of the unusually dense regions seen in the CT scan of

---

[8] *Subdural Hematoma*, Medline Plus, *supra* note 3.

[9] *See also Shaken Baby Syndrome*, Medline Plus, *supra* note 2.

Desiree's brain even constituted negligence. Dr. Ajl stated that an MRI would have helped Desiree's doctors determine whether there was a subdural hematoma and that "[t]he failure to obtain the MRI of the head promptly and to further investigate the abnormalities was a substantial departure from accepted professional judgment and a departure from accepted medical practice." Ex. TT, Ajl Report 2. While Dr. Ajl supports plaintiffs' claim that an immediate MRI was required during the first hospitalization, Dr. Molofsky stated in his report that the MRI should have been performed prior to February 27, 1996, when child abuse was ultimately strongly suspected. Ex. WW, Molofsky Report 6. Moreover, at his deposition he declined to say that the MRI should have been taken during the first hospitalization. When asked whether there was "a specific date that the MRI should have been performed prior February 27, 1996," he responded that his "conclusion would pertain to any time before she got sick on the 26th." Ex. N, Molofsky Dep. 401:16-20. When pressed further on the issue, he simply repeated that the MRI should have been taken "[b]etween the time it as recommended"—on February 2nd—"and the time she came into the hospital"—on February 27th. *Id.* at 401:22-402:4. Dr. Molofsky's testimony is insufficient to establish that Dr. Schubert was negligent in failing to order an immediate MRI. While Dr. Ajl's testimony would arguably have been sufficient to submit a cause of action for malpractice against Dr. Schubert to a jury, plaintiffs have not named her as a defendant in this case. Instead, Dr. Schubert now serves as Desiree's current treating neurologist. Pls.' Opp'n Br. 17.

### 2. *Failure to recognize rib fractures on the February 18th chest x-ray*

On February 18, 1996, two days after she was discharged, at approximately 7:45 p.m., Maitland brought Desiree back to KCHC with complaints of nasal congestion, coughing and occasional vomiting after coughing. Ex. CC, at M000187, M000192, M000214. A chest x-ray was taken of Desiree later that night. The results of this x-ray were not discussed or reported in

any clinical notes or typewritten report, on any date during this admission. A handwritten report concerning this chest x-ray, however, did not indicate rib fractures. Ex. PP. Nonetheless, Drs. Ajl and Molofsky testified that they had personally examined Desiree's February 18 chest x-ray and saw rib fractures. Ex. M, Ajl Dep. 346:16–347:9; 350:16–351:21; Ex. N, Molofsky Dep. 172: 7–15.

On the same visit, the attending pediatrician at KCHC, Dr. Jeffrey Birnbaum, examined Desiree and found her alert and active in no apparent distress and that she had bilateral rhinorhea and congestion. Ex. CC, at M000200-201. Dr. Birnbaum testified that he was trained to identify signs of child abuse and neglect, and would have noted any signs of abuse if he noted any while examining Desiree. Ex. J, Birnbaum Dep. 115:13–117:13. He did not note any signs of abuse. SVS Defs.' Rule 56.1 Stmt. ¶¶ 268-69. Because Desiree did not have any seizures during her second hospitalization at KCHC, Dr. Birnbaum's opinion was that Desiree's seizure disorder was under control. Ex. J, Birnbaum Dep. 49:2-8.

Desiree was discharged from KCHC on February 22, 1996. At that time, she was alert and active and her lungs were clear. Hosp. Defs.' Rule 56.1 Stmt. ¶ 15; Ex. Y, 742, 767. Desiree's hospital records for this admission do not have any notes regarding any bruises, abrasions, cuts, marks, or injury to Desiree. SVS Defs.' Rule 56.1 Stmt. ¶ 269. Nor do the notes reflect any bruising, pain or tenderness to Desiree's rib cage. *Id.* ¶ 270. The diagnosis, following this hospitalization, was that Desiree had suffered from acute respiratory infection, convulsions, and anemia. *Id.* ¶ 277. She was to continue taking Phenobarbital to control her seizures.

In connection with Desiree's second hospitalization, plaintiffs claim that the physicians at KCHC took no action to treat Desiree's fractured ribs, and that the fractured ribs were a sign of

the abuse that Desiree allegedly suffered prior to February 1, 1996 due to violent shaking. Plaintiffs have stipulated that the City and SVS defendants had no actual knowledge of the broken ribs until after the third hospitalization. Ex. N, at 429. The question that remains is who at KCHC had knowledge of the broken ribs at the time of the second hospitalization on February 18, 1996. There is no evidence that Dr. Birnbaum had any knowledge that the x-ray taken on February 18th indicated that Desiree had any broken ribs—as plaintiffs appear to acknowledge. Pls.' Opp'n Br. 52 ("Whether Dr. Birnbaum ever read the report is unclear . . . ."). Nevertheless, they claim that "as Desiree's attending physician, it was his responsibility to obtain . . . and read" the report. *Id.* This claim ignores the fact that there does not appear to have been a typewritten report of the February 18th x-ray, and the wet read did not indicate the existence of broken ribs.

Plaintiffs argue that there was in fact a typewritten radiology report, which "a KCHC radiologist read nine days later [on February 27], and which is now missing, either was never placed in Desiree's chart or was placed in the chart and later removed." *Id.* Plaintiffs' claim that the February 18th radiological report is specifically referred to in the report of two resident radiologists, Dr. A. Levitin and Dr. R. Orentlicher, dated March 6 and 7, 1996. *Id.* at 52-53. The report, which relates to an x-ray of Desiree's ribs performed on February 27, 1996, observes that "[f]ractures of the left 4th, 5th, 6th and 8th ribs are *again* noted" and that "[b]attered child should be considered *as stated on the prior reports*." Ex. DD, at M000424 (emphasis added). This report contains two dates—March 6 and 7, apparently because the two doctors approved it on different days. Plaintiffs argue that the "prior reports" referenced are "radiology reports," implying that they pertain to the February 18th x-ray, but cite no evidence for this interpretation. *See* Pls.' Rule 56.1 Stmt. ¶ 192. The record evidence, however, shows that by this time, there was indeed a report that mentioned "battered child": A March 4 skeletal survey by Dr. Lim (the

report of which is dated March 6) explicitly states that the rib fractures are "SUSPICIOUS OF BATTERED CHILD." Ex. DD, at M000431. Desiree's hospital records also reflect an explicit use of the term "battered child," in Dr. Lim's March 4 notes. *Id.* at M000289. Although these "reports" are the most plausible candidates for the "prior reports" referenced in the March 6/7 report of Dr. Levitin and Dr. R. Orentlicher, there is no indication whether Dr. Levitin or Dr. Orentlicher were deposed or whether plaintiffs sought any discovery from them or KCHC concerning the meaning and import of these notes. Plaintiffs cannot create a triable issue of fact—concerning whether Dr. Birnbaum was aware of Desiree's rib fractures on February 18, 1996, merely on the basis of these ambiguous and unexplained references—especially where the record evidence contains an adequate explanation for the reference.[10]

This having been said there is evidence from which a jury could find that the radiologist, who must have read the February 18th x-ray misread it. Plaintiffs did not name the radiologist as a defendant in this case. Moreover, even if this lapse fell into the category of gross-negligence, it would not constitute a basis for imposing liability on NYCH, as opposed to the radiologist. Indeed, even with respect to him, the record tends to undermine the existence of "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. Specifically, Dr. Ajl, plaintiffs' expert, testified that the healing rib fractures on the February 18th x-ray "were at least a week to two weeks old," and that they "seemed to be the same age approximately." Ex. M, Dr. Ajl Dep. 173:14-20. Moreover after further clarification, he said "seven to twelve days" was the total range. *Id.* at 175:5-25. This timing would place the injury to the ribs at no earlier than February 6th, while Desiree was

---

[10] Another document plaintiffs cite simply references the existence of the February 18 chest x-ray, without any reference to any report of the chest x-ray. *See* Ex. DD, at M000286. The same is true of the deposition testimony of Dr. Molofsky upon which plaintiffs also rely for support. Ex. N, Molofsky Dep. 172.

hospitalized at KCHC, and not under the care of Maitland.  Significantly, Janice Maitland, who it will be remembered is a pediatric nurse, suggested that one of the procedures that Desiree underwent while at the hospital could have caused injury to her ribs.  Ex. K, Maitland Dep. 80:21-81:2.

### 3.    Failure to connect growth in Desiree's head circumference to abuse

Dr. Molofsky's expert report stated that the circumference of Desiree's head increased 3.5 cm between her first and second hospitalizations, which clearly suggested intracranial pathology.  Ex. WW, at 2; *cf.* Ex. 64, Chari Dep. 20.  Specifically, Dr. Molofsky refers to a measurement of Desiree's head circumference taken on February 2, 1996, of 36 cm, *see* Ex. BB, at M001801, and another taken on February 18, 1996, of 39.5 cm, *see* Ex. CC, at M000197.  He then opines,

> [I]f it had been recognized on her 2/18/96 admission that she had excessive head growth her physicians would have been alerted to her intracranial problems and further studies done to determine what was going on. . . .  It is my opinion that had there been proper follow up, had there been recognition of her brain injury during and following her 2/1/96 hospitalization that additional injury would have been avoided.

Ex. WW, Molofsky Report 6–7.

Dr. Chari testified that it was for standard practice for KCHC doctors to request charts from prior hospitalizations when an infant was hospitalized subsequently.  Ex. 64, Chari Dep. 35:9–18.  Nevertheless, Dr. Birnbaum failed to request and review Desiree's hospital chart from her first hospitalization.  Ex. J, Birnbaum Dep. 22:24-23:20.  Plaintiffs allege that Desiree's head circumference when she was admitted on February 1st, was 36 cm and that by February 18th, her head circumference had increased to 39.5 cm, a fact which should have alerted Doctor Birnbaum to the possibility of "intracranial pathology."  Ex. WW, Molofsky Report 2.  The problem with this argument is that four separate measurements were taken of Desiree's head circumference on

February 1st and 2nd. The first measurement by Dr. Melanie Bravo, the pediatrician to whom Maitland initially took Desiree on February 1st, was 38.5 cm. Ex. FF, at SVS 1078. The second measurement taken at Desiree's admission to the KCHC emergency room was 36 cm, which was consistent with a subsequent notation on February 2nd by Dr. Chari. Ex. BB, at M001796-1801, 1806. Significantly, Dr. Schubert's measurement on February 2nd was 38.5 cm. *Id.* at M001809. If the accurate measurement was 38.5 cm, instead of 36 cm, then the measurement from February 18th would have indicated an increase of only one centimeter, which Dr. Molofsky stated "would be [an] appropriate" increase from February 2nd to February 18th. Ex. N, Molofsky Dep. 215:9-14.

Nevertheless, on the assumption that the prior records indicated a significant growth in Desiree's head circumference, Dr. Birnbaum's failure to review these records was contrary to the standard practice of doctors at KHCH to obtain charts from prior hospitalizations when an infant was hospitalized subsequently. Ex. 64, Chari Dep. 35:9–18. Under these circumstances, Dr. Birnbaum's failure to follow standard practice cannot be a basis for sustaining plaintiffs' § 1983 cause of action against HHC or KHCH on the theory that these entities countenanced the malpractice in which Dr. Birnbaum engaged in this case. Again, without more a municipal entity would not "be liable . . . if one of its employees happened to apply" an otherwise standard constitutional policy "in an unconstitutional manner, for a liability would then rest on *respondeat superior*," a doctrine which is inapplicable to actions under § 1983. *City of Canton*, 489 U.S. at 387. At most, Dr. Birnbaum's departure from standard practice would provide a basis for a cause of action against him for negligence.

### 4. *Failure to investigate Maitland's low dosing of Phenobarbital*

Desiree had been prescribed Phenobarbital to control her seizures during her first hospitalization. Plaintiffs allege that laboratory tests from February 18, 1996 show that

Desiree's Phenobarbital level was 11.2; a therapeutic level would have been at least 15. Pl.'s Opp'n Br. 51; Ex. CC, at M000216. Moreover, they allege that Maitland admitted that Desiree had been given Phenobarbital only once per day, rather than twice as prescribed. Pls.' Opp'n Br. 51. Plaintiffs do not cite any record evidence for this proposition, and I have been unable to locate any. On the contrary, Maitland testified in her deposition that she had given Desiree Phenobarbital "as prescribed." Ex. K, Maitland Dep. 77:15-17. Moreover, even assuming the accuracy of plaintiffs' allegations, plaintiffs fail to trace any direct causal link between Dr. Birnbaum's alleged failure to ask Maitland why she did not administer the drug as prescribed and the injuries that are the subject of this lawsuit.

### 5. Summary of plaintiffs' allegations against HHC and KCHC

Plaintiffs' argument that an MRI should have been ordered during Desiree's first hospitalization is significantly undermined by the unwillingness of their own expert—Dr. Molofsky—to so testify. The most that could be said from the testimony of plaintiffs' other expert—Dr. Ajl—is that Dr. Schubert was negligent, and even then it is arguable whether there is sufficient evidence to go to a jury under this theory. Indeed, Dr. Schubert was not named as a defendant and is currently Desiree's treating neurologist. The second hospitalization was marked by Dr. Birnbaum's failure to obtain the prior hospital records for Desiree, which was plainly contrary to the hospital's practice. The premise that the records of the earlier hospitalization would have demonstrated an alarming growth in Desiree's head circumference, however, is undermined by the conflicting evidence of the precise measurements of her head during that admission. While an unidentified radiologist who examined a chest x-ray taken during the second hospitalization failed to notice that Desiree had healing rib fractures, that

evidence would again not necessarily establish that Desiree suffered the rib fractures injury while in Maitland's care.

Setting aside the evidence undermining plaintiffs' specific claims of malpractice, the alleged deficiencies in the care of a single patient are insufficient to satisfy the definition of a "widespread practice" of grossly negligent care such that it can be said that the policymaking officials of KCHC had "either actual or constructive knowledge of it yet did nothing to end the practice." *Davis v. City of New York*, 228 F. Supp. 2d 327, 337, 346 (S.D.N.Y. 2002). Nor does it provide a basis for concluding that they were deliberately indifferent to their obligation to supervise or train. *See Connick*, 131 S. Ct. at 1360.

## C.    City Defendants

Plaintiffs make a multifaceted argument to establish § 1983 liability on the City. I will address each of their arguments below.

### 1.    The City's Monitoring of Desiree's Medical Care

The plaintiffs argue first that the City failed to properly monitor Desiree's medical care at KCHC in a way that would have alerted it to the fact that she had suffered abuse while in Maitland's care. They begin their analysis of the City's liability by observing that it had an affirmative duty to protect Desiree from harm inflicted by third parties. Pls.' Opp'n Br. 26. The standard which they posit is that the City "will be held liable for the harm that third parties inflict if they are deliberately indifferent to a known risk or to a known duty, or if they place individuals in a dangerous situation: 'state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence." *Id.* (citing *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009), and *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981)) (internal citations omitted).

Plaintiffs' cannot prevail under this standard. Desiree was taken to KCHC by her foster parent on three separate occasions, and the evidence is clear that neither the City nor SVS were appraised during or after her first two visits that there was any suspicion of Shaken Baby Syndrome. More significantly, the argument that the City and SVS social workers should have suspected Shaken Baby Syndrome, when none of the medical staff attending to Desiree did, is undermined by the testimony of plaintiffs' own social work expert. Dr. Blake testified that (1) even now, she does not know whether Desiree was a victim of Shaken Baby Syndrome, Ex. O, Blake Dep. 140:16–20, (2) social workers do not diagnose Shaken Baby Syndrome, *id.* at 140:20–141:23, (3) social workers are trained to, and do in fact, rely on doctors to diagnose that condition, *id.* at 141:24–142:2, 166:7–18, and (4) Desiree was only diagnosed by doctors with Shaken Baby Syndrome after the third hospitalization, after which time Desiree was never returned to Maitland's custody, *id.* at 142:3–11. Under these circumstances, while plaintiff argues that "the City, upon receiving notification that a child in their custody had an abnormal CT-Scan, did not do what any fit parent with custody would have done: demand immediate further tests until an answer was found," Pls.' Opp. Br. 30, it is unreasonable to expect that any ACS employee involved in the case could or should have scrutinized Desiree's medical records and countermanded the doctors' diagnosis and prescribed course of treatment.

On the contrary, it was objectively reasonable for the City caseworkers to rely upon the diagnosis of medical professionals, who in this case attributed the symptoms underlying Desiree's hospitalizations to an infection rather than child abuse. *See, e.g.*, *V.S. v. Muhammad*, 595 F.3d 426, 431 (2d Cir. 2010) ("Even if the ACS personnel here involved had been aware of [the physician's] alleged 'reputation' for overdiagnosing child abuse, it still would not have been unreasonable for them to rely on [that doctor's] diagnosis [that the child suffered from Shaken

Baby Syndrome]. . . .").  Indeed, Dr. Ajl testified that he not had seen any evidence to suggest that "any of the foster care people, whether it's the City or the agency, could have known that this child was abused before [he] made the diagnosis of inflicted trauma." Ex. M, Ajl Dep. 407:3–10; *see also* Ex. N, Molofksy Dep. 387:14-21.  He further testified at his deposition that the principal signs of abuse in this case—namely, the subdural hematoma and posterior rib fractures—could not be detected by a layperson examining Desiree.  Ex. M, Ajl Dep. 555:10–17. Medical professionals, Dr. Ajl stated, would have to bring those injuries to the attention of a layperson.  *Id.* at 555:18–22.  Dr. Molofsky likewise testified that he is not aware of any physician who suspected that Desiree was a victim of Shaken Baby Syndrome prior to her third hospital admission.  *See* Ex. N, Molofsky Dep. 360:6–12.

Thus, plaintiffs' argument comes down to the fact that SVS advised the City through the W-853D forms that Desiree was hospitalized on February 2nd and 16th and that "she had an abnormal CT scan on February 2, 1996." Pls.' Opp'n Br. 30.  Toni Taylor, an employee of OCI, testified that agencies are required to contact OCI whenever a foster child is hospitalized, Ex. 82, Taylor Dep. 18:6–9; however, OCI does not initiate an investigation unless the agency also contacts the State Central Register and submits a Form 2221—Report of Suspected Child Abuse or Maltreatment, *id.* at 19:2–14, in which case the State refers the matter to OCI for investigation.  *See also* Ex. 66, Cortez Dep. 64:16–65:8.  More specifically, Taylor testified that OCI did not automatically investigate Desiree's hospitalization, although SVS submitted a Form W-853D, "[b]ecause there was no evidence that an investigation was needed.  The child was only hospitalized." Ex. 82, Taylor Dep. 18:15–17.[11]

---

[11] The form filed on February 2nd contains the following diagnosis and treatment: "Congenital infection and Anemia – Foster child was given blood transfusion to control her blood count level.  She is given now antibiotics; and Acyclocir." Ex. FF, at SVS 1231.  Moreover, it indicated that the CT-scan showed that the foster child had "sinusitis and increase density of the brain." *Id.* at SVS 1232.  The prognosis and finding indicated that while the

These considerations aside, plaintiffs' argument regarding the failure to follow-up on the W-853D form ignores a central element of the imposition of liability under § 1983, namely that a plaintiff must establish "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. There is no evidence that even if the City had made any inquiry at KCHC about Desiree's condition that it would have obtained any evidence that Desiree was abused. Indeed, the record shows that the defendant, Robert Jackson, a ACS supervisor, and others at ACS (as well as staff of the agency) were in constant communication with KCHC and that the hospital repeatedly told ACS that the child's condition was being addressed as a matter of presumed infection. City Defs.' Reply Br., Ex. Contacts re Med. Cond'n, at 1042, 1052-53, 2662-73, 2677, 2826. No one at KCHC ever suggested that this was an abuse case (or that there was any reason to even suspect abuse) before Dr. Ajl did in late February 1996. Ex. 69, 20-22.

## 2. *The City's Alleged Knowledge of Child Abuse in Foster Care Placements*

ACS was permitted to delegate to SVS certain responsibilities for the provision of foster care services. Nevertheless, such delegation did not relieve ACS of responsibility for properly supervising SVS or other agencies to ensure that foster children received adequate care and protection from harm. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("[A]llowing delegation, without more, to defeat municipal liability would contravene the remedial purposes of § 1983."). To prevail under Section 1983 against the City on a failure-to-supervise theory of liability, plaintiffs must

---

doctor couldn't "give a discharge date yet," it indicated that Desiree's "condition is stable." *Id.* The one page excerpt of the W-853D form filed on February 22nd, which plaintiffs provided, contains the following diagnosis and treatment: "Bronchitis . . . mist tint with oxygen, Phenobarbital & Serinsol." Ex. 32, at SVS 1044.

> (1) establish [City] defendants' duty to act by proving they should
> have known their inadequate supervision was so likely to result in
> the alleged deprivations so as [to] constitute deliberate
> indifference . . . ; (2) identify obvious and severe deficiencies in
> the [City] defendants' supervision that reflect a purposeful rather
> than negligent course of action; and (3) show a causal relationship
> between the failure to supervise and the alleged deprivations to
> plaintiffs.

*Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007); *see also Connick*, 131 S. Ct. at 1360; *Tylena M.*, 390 F. Supp. 2d at 308 (holding that a failure-to-supervise claim requires plaintiff to show that "the abuse had been occurring and known or objectively manifest to the agency or reasonably discoverable by the City for a sufficiently long period of time before the children were removed from the [foster home], such that closer monitoring of the placement by the City prior to that date could have detected the alleged abuse.").

Plaintiffs begin their discussion of the City's knowledge of its alleged failure to protect children in foster care with various reports going back as many as twenty years before the placement of Desiree. These reports are not particularly helpful to plaintiffs' arguments both because they are dated and because they demonstrate efforts by several supervisory personnel within the City, with responsibility in this area, to address problems associated with the care of foster children. Pls.' Opp'n Br. 31. Indeed, the only document plaintiffs cite, which arguably deals with the circumstances that they claim caused the alleged abuse in this case, is what they characterize as a 1983 report by the Vera Institute. This document is in fact a guidebook "prepared as part of the Foster Care Child Protection Project, under contract with the New York City Human Resources Administration, Office of Special Services for Children, and with the New York State Department of Social Services." Ex. 10, at i. One of the problems the City-commissioned study identified was the "failure of caseworkers to assure that working foster mothers had arranged adequate substitute child care." *Id.* at 8. This report provided

"[g]uidelines for agency staff that address [this and other identified] problems." *Id.* These efforts by the City, particularly the commissioning of the Vera Institute Guide for Social Workers, hardly bespeak a policy of deliberate indifference.

Plaintiffs then jump ahead almost a decade later to what they describe as the New York State Comptroller's highly-critical reports of the City's foster care system issued in 1992, 1994 and 1996. Pls.' Opp'n Br. at 32. The 1992 report appears to be an audit and report "on the Certification and Licensing Process of the [*New York State*] *Department of Social Services Foster Care Program.*" *See* Ex. 9 (emphasis added). Indeed, without rehashing the contents of the document in detail, the executive summary clearly indicates that it does not contain any significant discussion or criticism of the City's foster care program, and certainly of any practice or policy of deliberate indifference of the City. *Id.*

The 1994 draft report on Children in Foster Care at Voluntary Agencies does contain criticism of the City's foster care program, which specifically related to the failure of foster care agencies to provide all required services and adequate case management. Ex. 14. The only direct reference to allegations of abuse was the failure of agencies to properly report such allegations. Specifically, the Comptroller noted that agencies are supposed to report allegations of abuse to the New York State Central Registry Hotline, which then forwards to them to CWA's Office of Confidential Investigations for investigation. *Id.* at 10. Other criticisms, to the extent relevant here, dealt with the fact that the required minimum number of caseworker contacts with the foster parent and child were not made. *Id.* at 11. These requirements called for at least two face-to-face contacts between the caseworker and child, and caseworker and the foster parent during the first month of foster care. *Id.* at 11-12. Subsequently, although the City indicated it

would address problems identified in Comptroller's draft report, *see* Ex. 16, at 24,[12] the Comptroller advised the City that it had not implemented twelve of the fourteen recommendations made to it in the draft report. Ex. 38, at 2. The problem with these last two documents is that, even if they demonstrate some sort of policy or practice with the deficiencies identified, they fail to show that "a direct causal link" exists "between [the] municipal policy or custom and the alleged constitutional deprivation" in this case. *See City of Canton*, 489 U.S. at 385. Indeed, in this case, the minimum number of face-to-face meetings required were met. *See infra* p. 32-33.

Plaintiffs also argue that the City had knowledge "that all foster children lived under a threat of serious harm, even though only a comparatively small number may ultimately suffer abuse." Pls.' Opp'n Br. 33 (internal quotation marks omitted). I am not sure exactly what legal argument follows from this proposition. While the suggestion that all foster children live under a threat of serious harm may be somewhat overwrought, "it is acknowledged by professionals in the child protection field," as Dr. Blake wrote, that "an unintended consequence of . . . removing children from their parent's home is maltreatment in substitute care." Ex. 53, at 5. Nevertheless, as Judge Chin observed, "[t]here is risk involved in virtually any foster care placement, and thus knowledge of risk alone is not deliberate indifference." *Phifer ex rel. Phifer v. City of New York*, 2003 WL 1878418, at *5 (S.D.N.Y. April 15, 2003). Nor does the awareness of such a risk establish that "[i]n 1996, the City had actual knowledge that it failed to protect children in its custody." Pls.' Opp'n Br. 31. Indeed, in the 1990s, the City had some 49,000 children in its foster care system, and its system was encountering large numbers of "children damaged by circumstances that were rare or nonexistent before the 1980s." Ex. 13, Celia W. Dugger,

---

[12] The report noted that "CWA stated that it 'has implemented a revised series of guidelines for [CWA's Office of Case Management's] review and approval of [Voluntary Child Care Agency] casework activities." Ex.16, at 24.

*Troubled Children Flood Ill-Prepared Care System*, New York Times, Sept. 8, 1992. Specifically, the "upsurge in homelessness in the [1980s], fueled by crack and AIDS, ha[d] not only led to the destruction of thousands of families and produced a huge influx of children into the foster care system, it has also contributed to an extraordinary new set of deprivations and emotional traumas." *Id.* Under these circumstances, the fact that plaintiffs can reference a handful of news articles on cases of abuse in the foster care system, most of them in the first half of the 1990s, hardly establishes the City was deliberately indifferent to the threat or possibility of abuse caused by gross negligence of its employees.[13]

Plaintiffs likewise fail to provide any support sufficient to allow a jury to conclude that "[i]n 1996, the City did not take any affirmative steps to protect children in its custody." Pls.' Opp'n Br. 33. They rely principally on three documents—Pls. Ex. 6 (CWA's Foster Care Standards issued in 1993), Pls. Ex. 7 (CWA's Foster Care Standards issued in 1995), and Ex. 8 (CWA's Foster Care Standards issued in 1998), which they claim demonstrate the City's disavowal of "its duty to protect the children in its custody." *Id.* Plaintiffs allege that the 1993 standards only require child welfare staff to report suspected abuse after the abuse has taken place. They continue that the 1995 standards contain "only one provision for the prevention of child abuse in foster care, that ACS 'shall foster awareness in children of all potentially abusive situations and how to handle them,' . . . and require only to report suspected abuse after [it] has taken place." Pls.' Opp. Br. 34 (quoting Ex. 7, at 21).

Plaintiffs have failed to provide a complete copy of any of these three documents. Instead, they appear to assume, that if the key words "child abuse," are missing from a particular

---

[13] Except to the extent that judicial notice can be taken of certain facts, the articles plaintiffs cite are hearsay and are inadmissible for the truth of their contents. If they reported that children were *abused because of the gross negligence of the City employees*, they would be admissible as to the issue of the City's knowledge. The articles, however, do not contain such statements. *See* Ex. 13.

page of the Standards, then the standards do not address the issue of protecting children in foster care from abuse. Thus, they have provided at most one or two page excerpts of these standards. Nevertheless, even the pages provided demonstrate the manner in which these standards have been misrepresented. Just above the heading "Child Abuse Prevention and Reporting" in the 1995 standards promulgated by Karen Croft is part of a section which provides for among other things "monthly social worker/foster parent contact" and other provisions that are obviously designed to monitor and evaluate the foster care parent's performance. *See* Ex. 6, at 32; Ex. 7, at 19; Ex. 8, at 20. The 1998 Standards, which appears to duplicate the 1995 Standards, contains the entire section dealing with "staff performance evaluation [and] foster parent recertification." Ex. 8, at 20. This subsection clearly sets out significant standards that operate to protect foster children. *Id.* Indeed, plaintiffs' own social work expert, Dr. Blake, acknowledged that "policies/procedures existed at CWA for outlining the responsibility of staff to monitor children in placement." Ex. 53, at 10; *see also id.* at 6 ("[T]he requirement to thoroughly study a babysitter is so clearly stated in all CWA/ACS policy/procedure as well as all SVS policy/procedure."). While Dr. Blake expressed concerns regarding the staff's understanding of these monitoring policies/procedures and the review before Maitland's home was approved by SVS for placement of children, her report establishes the baselessness of the plaintiffs' argument that there were no standards in effect to protect foster children from abuse.

Equally without merit is plaintiffs' claim "ACS did not instruct its caseworkers to consider a child's medical needs when making an initial placement." Pls.' Opp'n Br. 27. In support of this allegation, plaintiffs cite a document dated July 14, 1992, which is apparently published by the CWA—"Placement Referrals from the Office of Placement Services and Emergency Children's Services." *See* Ex. 37. The two pages that plaintiffs include from the

body of the document are taken from the section entitled "Guidelines for Selecting an Appropriate Placement." *Id.* at PHELAN 21517. These Guidelines provide, in relevant part:

> At the time placement is required, the case manager identifies the child's characteristics and service needs, as available from CWA case records and collateral contacts. . . .
>
> ○     Placement must be in the least restrictive level of care that can safely maintain the child and provide all services required by the child . . .
> ○     The child caring agency must be able to provide the services, level of care and type of program required by the child . . . .

*Id.* This document offers no support for plaintiffs' allegation of a municipal policy of deliberate indifference to the medical needs of foster children in their initial placement.

Moreover, turning to Dr. Blake's testimony, as it relates to the facts of this case and to the issue whether there was "any direct causal link between" the alleged deficiencies specified in her report and the Desiree's injuries, the following colloquy is telling:

> Q: As you sit here right now, are you able to say that anything that the city did or not do was . . . the cause of any harm to the child?
> [Plaintiffs' Counsel]: Objection.
> A: I don't know.

Ex. O, Blake Dep. 172:19-24. Perhaps one reason she could not say that anything the city did was the cause of any harm to Desiree is because even the adherence to best practices is not always sufficient to prevent abuse. This is illustrated by two of the newspaper articles plaintiffs have supplied. Pls. Ex. 13. In one instance, police responding to a call of an abused foster child stated that "there were no warnings that could have prevented her death." Ex. 13, Kimberly J. McLarin, *Abused in One Home, Child Meets Death in the Next*, New York Times, May 26, 1995. They described the basement foster home "as immaculate," and they observed that neither the child's brother and stepsister, nor the two biological children of the foster parents, aged 1 and 11,

displayed any signs of abuse.  *Id.*  Similarly, in another sad case, ACS found that the private foster care agency caseworkers had followed proper procedures, including "quite extensive contact with" the foster parent and child—35 visits in the preceding 11 months.  Ex. 13, Michele Mcphee, et al., *2 Charged in Foster Death Girl, 4, Badly Beaten – Officials*, NY Daily News, July 11, 1997.  The head of the Brooklyn Legal Aid Office, who was representing three of the foster child's siblings, also confirmed that "there were no warnings of trouble in the [foster] home."  *Id.*

### 3.  The City's Alleged Knowledge of SVS's Failings

Plaintiffs' final argument is that "the City had actual knowledge that SVS failed to protect children in its foster homes but did nothing to address the problem."  Pls.' Opp'n Br. 36. They support this argument by citing the City's response to the Comptroller's 1994 Draft Report, which they claim describes that "of a random sample, SVS had 41 percent of the cases in which there was an allegation of mistreatment in foster care – or six times the rate of other agencies." *Id.* (citing Ex. 15, at 604115).  In the document plaintiffs cite, however, the City disputed the Report's allegation that nine cases of abuse and neglect went unreported or uninvestigated, and noted that the agencies had provided appropriate documentation in six of the cases.  Ex. 15, at 604108.  Moreover, none of these cases appear to involve children placed by SVS.  *Id.* at 604115-604116.  Nor is it clear to me where the 41 percent figure comes from.  More specifically, SVS's responses to the audit demonstrate the nature of the problems raised by the Comptroller.  Thus, SVS explained that:  (1) an incarcerated parent could not be present for a planning conference because the prison would not transport him to the meeting, (2) a child had relocated to the south, so there could not be in person contact except when the social worker was sent to Alabama, (3) the complete and updated medical files on two out-of-state children, who

were under care in southern states, were indeed available in the records, (4) the failure of the adoption milestones on a case newly arrived at the agency, where the milestones of Change of Goal and Placement in Adoptive Home had already been filed by the time the child was placed, and (5) the placement of a child in a St. Vincent's Services group home for a short time, such that it fell outside of the Uniform Case Record reporting requirements.  *Id.*

Plaintiffs next argue that in February 1994, two years before the events at issue in this case, "the City had received notice in a dramatic form that children in foster care with SVS were at risk: Bruce Boykin, a six-week-old child placed with SVS, had been violently shaken and assaulted, suffering serious brain damage."  Pls.' Opp'n Br. 36 (citing Exs. 43-45).  This single incident hardly establishes that all "children in foster care with SVS were at risk."  Indeed, the documents the plaintiffs cite do not indicate any specific failing on the part of SVS, and one of the investigative reports contains a summary of an interview with Bruce's natural mother, who "was very positive about SVS, especially casework Pat Casey, who was her worker for [her] other child in care."  Ex. 44, at 400106.

More significantly, the logic of plaintiffs' argument would suggest that each and every foster parent SVS ever selected or supervised is an abuser, and that the City should have not made any foster care placements with SVS.  This argument is flatly inconsistent with plaintiffs' opening argumentative factual statement, which criticizes the City for failing to place Desiree in the foster home of Delores Magwood, in which her biological brother had been placed by SVS and had been subsequently adopted by Magwood.  Pls.' Opp'n Br. 3.  The City apparently decided against the placement with Magwood only because her certification as a foster parent had lapsed and she required recertification.  *Id.* at 4.  The recertification process was expected to take only two weeks, although it took six weeks until February 21, 1996.  City Defs.' Reply Br.,

Ex. Docs. Re. Magwood, at 2157. Nevertheless, plaintiffs argue that the City "could have issued an emergency certification for Desiree to live with Ms. Magwood, but did not." Pls.' Opp'n Br. 4. Significantly, the plaintiffs fail to say that Magwood was a St. Vincent's Services foster parent, and that they too, as Desiree's adoptive parents, only came into contact with Desiree as a St. Vincent's Services foster care placement. Ex. LL, at 0955; Cmplt. ¶ 49 (Aug. 17, 2004).

Nor is there any merit to plaintiffs' claim that "ACS did not require St. Vincent's Services to take corrective action as a result of the failure to investigate Ms. Maitland's babysitting arrangements." Pls.' Rule 56.1 Stmt. ¶ 347. Plaintiffs cite a document, Ex. 42, PH 21437, without indicating what the document is or what it purports to show, and without even including the document in Exhibit 42. Clearly, this is insufficient. But even if the City knew that, as plaintiffs allege, SVS failed to investigate Maitland's babysitting arrangements, plaintiffs have not identified any evidence that the City acted pursuant to a municipal policy or custom in failing to demand that SVS inquire further into Maitland's backup childcare plan. The existence of such a municipal policy or custom might have been demonstrated by evidence of the City's repeated failures to require corrective action after SVS breached its duties to investigate potential foster parents' backup childcare plans in the past. But plaintiffs cannot establish the existence of a City policy or custom, which allegedly caused a constitutional violation in this case, by citing the single failure at issue here.

### 4. *Failure to Train*

Plaintiffs allege that "[t]he City did not train ACS caseworkers on recognizing or protecting children in foster care from abuse." Pls.' Rule 56.1 Stmt. ¶ 328 (citing Ex. 68, Dillard Dep. 45-50, 55); *cf.* Cmplt. ¶¶ 68–73 (Aug. 17, 2004). But once again, the document plaintiffs cite shows the opposite. Indeed the necessity for training ACS caseworkers appears to address cases in which the City took primary responsibility for the foster care of the child. *See* Pls.'

Mem. of Law on State Action 12, Oct. 14, 2011 ("When a child comes into foster care, the City .

. . decides whether to place the child under the care of a private foster care agency or to provide

care directly for the child through its own foster care agency, Direct Child Care.").

In any event, Yolanda Dillard, who appears to have been an ACS employee, testified as

to the training ACS provides:

> There [is] on-going training for all staff in ACS regarding abuse
> and neglect and what to look for. Specifically how to prevent, I
> don't recall any specific training how to prevent, but what to look
> for and as a case manager or caseworker going into a home, yes,
> there are ongoing training regarding that.

Ex. 68, Dillard Dep. 46:13–20. She further testified that ACS caseworkers were instructed to

visually inspect foster children whenever they visited a foster home "to see if there are any signs

of neglect or abuse." *Id.* at 46:21–47:2. Dillard also explained in some detail the "factors,"

which ACS caseworkers were trained to identify, that might signal neglect or abuse. *Id.* at

47:12–49:9. ACS caseworkers were also regularly trained concerning the special needs of foster

children who were exposed to drugs *in utero*. *Id.* at 49:10–50:20. Indeed, contrary to their

position, plaintiffs at one point state affirmatively that the City defendants and SVS defendants

"are employed and trained to recognize signs of child abuse." Pls.' Response to City Defs.' Rule

56.1 Stmt. ¶ 13. Plaintiffs have not cited any evidence that demonstrates the City made "a

'deliberate' or 'conscious' choice" not to train its employees in recognizing signs of child abuse

and protecting foster children from child abuse. *See City of Canton*, 489 U.S. at 389; *Walker v.

City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). Indeed, they have not come close to

satisfying the Supreme Court's requirement that there must be a "pattern of similar constitutional

violations by untrained employees . . . to demonstrate deliberate indifference" for the purpose of

failure to train. *Connik*, 131 S. Ct. at 1360. The cited evidence, instead, shows the exact

opposite.

## 5. *The Individual City Defendants:  Croft, Jackson, Felton, and Hoover.*

Plaintiffs' brief in opposition barely addresses the motion for summary judgment filed by individual defendants Jackson or Felton.  With respect to defendant Croft, plaintiffs argue that

> Kathryn Croft, who was a Deputy Commissioner, and the head of ACS, from 1994 through 1996, had no recollection of receiving . . . important reports [from the New York State Comptroller regarding problems with the City's foster care system] or taking any action in response to them.

Pls.' Opp'n Br. 32–33.  Plaintiffs cite, in support of this allegation, several pages from Croft's deposition transcript.  *See* Ex. 67 (including only four pages of Croft's deposition).  The Comptroller's reports are not even mentioned in this excerpt from Croft's deposition.  But even if plaintiffs' allegation against Croft were true, it would show that Croft was negligent in failing to read the reports, which are of limited relevance to the City's awareness of gross negligence on the part of its employees, and not that she was deliberately indifferent to an obvious risk of serious harm.  Nor can any significance be attached to her alleged lack of recollection, during a deposition taken on December 15, 2005, with respect to a report that she may have received nine or more years earlier.  More significantly, Croft drafted the 1995 CWA Foster Care Standards, discussed, *supra* p. 50, and Dr. Blake, plaintiffs' expert, acknowledged that during Croft's tenure, "policies/procedures existed at CWA for outlining the responsibility of staff to monitor children in placement."  Ex. 53, at 10; *see also id.* at 6 ("[T]he requirement to thoroughly study a babysitter is so clearly stated in all CWA/ACS policy/procedure as well as all SVS policy/procedure.").

Plaintiffs argue that "[d]efendant Hoover brought Desiree to Ms. Maitland's home, but stayed for only a few minutes.  Defendant Hoover did not make even the barest inquiry as to whether the home was suitable for this special-needs child.  In fact, defendant Hoover had no idea what went on in the foster home."  Pls.' Opp'n Br. 27–28 (internal quotation marks

omitted).  But plaintiffs also state that, "[i]n 1996, it was not part of defendant Hoover's job to protect Desiree from being abuse[d] or neglected in the foster home."  Pls.' Rule 56.1 Stmt. ¶ 327.  Indeed, Hoover so testified at her deposition. Ex. 73, Hoover Dep. 40:10-22.[14]  While it might be clear in hindsight that—especially insofar as the SVS home study might have been deficient—additional inquiries by City caseworkers into the appropriateness of the placement and the logistics of Maitland's backup childcare would have been helpful, there is no evidence that Hoover was grossly negligent with respect to an obvious risk of serious harm.  Indeed, it is not even clear that, had Hoover made any of the inquiries plaintiffs argue she should have made, she would have learned additional facts that would have alerted her to the risk of child abuse.  Consequently, the individual City defendants Croft, Felton, Jackson, and Hoover are entitled to summary judgment on plaintiffs' § 1983 causes of action.

---

[14]  After so testifying, Hoover was asked "whose job was it to protect the children in foster care from being abused or neglected?"  Ex. 73, Hoover Dep. 40:23-25.  The next page, indeed the next ten pages, of the deposition were not provided in plaintiffs Exhibit 73, so it is not possible to determine who at ACS was responsible.

## CONCLUSION

The respective motions of the City, SVS, and HHC for summary judgment on plaintiffs' claims under 42 U.S.C. § 1983 are granted.[15]  I likewise grant the motions of the individual defendants employed by the City, SVS and HHC for summary judgment.  Because all the federal claims have been dismissed, I decline to exercise supplemental jurisdiction over plaintiffs' state law claims.  The state law claims are, accordingly, dismissed without prejudice.

**SO ORDERED.**

Brooklyn, New York
December 30, 2011
Amended: January 3, 2012

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge

---

[15] The HCC counsel argues that KCHC cannot sue or be sued because it is merely a division of HHC and not a legal person.  HHC Mem. of Law in Support of Mot. to Dismiss 54-55, April 21, 2011.  This argument appears to be correct. *See Washington v. Brookdale Hosp.*, 511 N.Y.S.2d 317 (1987).  Nevertheless, even if KCHC were a separate jural entity, I would grant its motion for summary judgment.